## HANCOCK v. LUKE et al.

No. 2947.   Decided April 26, 1918.   (173 Pac. 137.)

1. MASTER AND SERVANT—CONSTRUCTION OF CONTRACT. A contract whereby first party issued to second party five shares of stock of a collection association upon payment of $2,500, and upon second party entering the employ of the collection association *held* a contract the main purpose of which was the employment of second party, the transfer of stock being an inducement to him to remain an employee of the association for a period of ten years. (Page 161.)

2. MASTER AND SERVANT—CONTRACT—RIGHT TO TERMINATE. Where a contract of employment did not specify duration of employment, either party could terminate the relationship at any time, although at time of employment stock in the employer company was sold to employee to induce him to remain with the company for a period of ten years. (Page 162.)

3. CORPORATIONS—STOCK TRANSFERS—EQUITABLE RELIEF. Where employee, employed under a contract of employment that either party could terminate at any time, buys stock in employer company upon limited understanding that employment is to continue for ten years, equity will not permit the company, where employment con-

tinued for only four years, to retain benefits of the stock transfer. . (Page 162.)

4. EQUITY—HE WHO SEEKS EQUITY MUST DO EQUITY. An employee who buys stock in employer company, upon implied understanding that he is to remain employee for ten years, cannot, because of the termination of employment after only four years, recover, in an action in equity, the purchase price of the stock, unless he does equity, and returns to the company what company had paid him as interest on such stock. (Page 163.)

CORFMAN, J., dissenting.

Appeal from District Court of Salt Lake County, Third District; *Hon. F. C. Loofbourow*, Judge.

For former appeal see 46 Utah, 26, 148 Pac. 452.

Action by George B. Hancock against Francis G. Luke and another.

Judgment for defendants. Plaintiff appeals.

REVERSED and remanded.

*M. E. Wilson* for appellant.

*Chris. Mathison* and *S. P. Armstrong* for respondents.

CORFMAN, J.

This was an action brought in the district court of Salt Lake County by the plaintiff for the rescission of a contract entered into between him and the defendants. The cause was before this court on a former appeal involving the sufficiency of the pleadings. Then a judgment had been awarded the plaintiff on his motion for a judgment on the pleadings. A reversal of that judgment was had by a divided court, and the cause was remanded to the trial court, with directions to permit the defendants to amend their answer, and also permit the plaintiff to amend his complaint, if so advised, and then proceed to try the case on its merits. 46 Utah, 26, 148 Pac. 452.

As the case is now presented on the record offered, it is alleged in the complaint that the plaintiff and defendants, on

or about the 12th day of December, 1908, entered into a written contract by the terms of which defendants agreed to sell, and the plaintiff agreed to purchase from the defendants, five shares of the capital stock of the Merchants' Protective Association, a corporation, for the sum of $2,500, in pursuance of which the plaintiff purchased of the defendants five shares of said stock and paid the defendants therefor said purchase price; that said contract further provided that the plaintiff should be employed for an indefinite period of time by the said corporation at a fixed salary, the defendants assuming to act for and representing said corporation in the making of said contract; that the plaintiff entered upon said employment on or about the 12th day of December, 1908, and continued therein until about the 1st day of January, 1913, during which time plaintiff received the monthly salary in said contract provided. It is further alleged that at the time the contract was entered into, and as an inducement thereto, defendants falsely and fraudulently stated and represented to the plaintiff that a certain collection business was owned and being conducted by the said corporation; that the corporation was capitalized for 100 shares of the par value of $1 each, of which the defendants were the owners of 85 shares; that the corporation was in an exceedingly prosperous condition, and that the actual value of said stock, owing to its assets consisting of collectible judgments amounting to $1,000,000, together with a reserve fund of $10,000 in bank, was $500 per share, and that said stock would earn and pay an annual dividend of not less than 12 per cent. on said price of $500 per share; that in purchasing said stock the plaintiff relied upon said representations as being true; that in truth and in fact all of said representations were false; that the said corporation had no assets or business; that said business was conducted by the defendants as individuals in the name of said corporation; that all the earnings of the said business were appropriated by the defendants; that the business was so conducted that neither the corporation nor the defendants had any assets to pay sums due clients which they were owing; that the plaintiff ascertained these facts during the month of June, 1912, and

in the month of January, 1913, gave notice to the defendants of his intention and desire to repudiate and rescind the contract entered into with the defendants, and made demand that they forthwith return to him the $2,500 paid by him for the stock, which defendants wholly failed and refused to do. Plaintiff prayed judgment against the defendants for cancellation of the contract and for the sum of $2,500, with interest and costs of suit.

The amended answer of the defendants admitted the entering into of a contract between plaintiff and the defendants, whereby the defendants sold to the plaintiff five shares of stock of the Merchants' Protective Association, and the plaintiff's employment at a stipulated monthly salary; denied all fraud and misrepresentation set forth in the complaint, and affirmatively alleged that at the time of the execution of the contract the plaintiff well knew that an agreement had been entered into between the defendant Francis G. Luke and the Merchants' Protective Association whereby the said defendant was entitled to all the earnings, profits, and income of the said corporation, including its portion of any and all judgments owned or controlled by it, and that the plaintiff had full knowledge of the true value of said stock. The answer further affirmatively alleged that since the incorporation of the Merchants' Protective Association the defendants have been the owners of more than 85 per cent. of its capital stock, which was of the small or nominal value of $1 per share, and the defendant Francis G. Luke, since said incorporation, had an agreement with the said corporation whereby he was entitled to its entire income, he paying all expenses of carrying on the business, including salaries of employees; that during said time the said corporation, and particularly since 1901, had carried on a lucrative and well-established law and collection business at Salt Lake City, due solely to the efforts and money invested by the defendant Francis G. Luke, and the defendants received anually large sums of money and profits therefrom; that during the year 1908 the plaintiff, being an attorney without experience and with restricted opportunities, was desirous of engaging his services with said corpora-

tion because of the opportunities it afforded for training and experience, and the defendants being willing to employ the plaintiff in the capacity of an attorney, but intending and desiring that the plaintiff should not be at liberty to quit said service at will, and as a condition of such employment, and particularly as an earnest that he would remain in their employ, required of plaintiff that he purchase five shares of the stock of said corporation for $2,500, and that plaintiff engage in said service for at least ten years, during which time defendants agreed to employ the plaintiff as an attorney and pay him a monthly salary with interest on said purchase price of the stock during the continuance of the agreement; that the defendants performed all the conditions of said contract on their part by paying to plaintiff during the four years he remained in said service interest in excess of statutory and reasonable rates on plaintiff's said investment, and a salary greatly in excess of the reasonable value of plaintiff's services, with the expectation and upon plaintiff's promise that he would perform the conditions of said contract and remain in the employment of the said corporation for the full term of ten years, and that after plaintiff had become proficient in conducting said business of collecting and litigation the defendants would thereby be recompensed for the losses sustained by them by payment to plaintiff in the early years of his employment under said contract in excess of the reasonable value of his services. The answer further affirmatively alleged that the Merchants' Protective Association was organized for the purpose of doing a general collection business, and its business entailed a large amount of litigation and numerous suits at law, and during the times mentioned was largely engaged in the business of practicing law; that the plaintiff was, at the time of making said contract, an attorney at law admitted to practice in the courts of the state of Utah, engaged his services as such under the said contract, and that the contract so entered into between the plaintiff and the defendants was against public policy, unlawful, and void. A copy of the contract was attached to and made a part of defendants' answer, and is as follows:

"Agreement between Francis G. Luke and James A. Luke, parties of the first part, and George B. Hancock, of the second part, witnesseth: The parties of the first part, in consideration of the payment of two thousand five hundred ($2,500) as follows: Nine hundred dollars ($900) cash on December twelfth, 1908, six hundred dollars within thirty days thereafter, five hundred dollars on or before one year after said date, the six hundred dollar payment and the two five hundred dollar payments to be represented by notes of even date hereof and secured by the five shares of stock mentioned hereinafter; and the employment of the party of the second part, as hereinafter set forth—hereby agree to sell to the party of the second part five shares of the capital stock of the Merchants' Protective Association Corporation, being five one-hundredths of the total capitalization, and to guarantee the profit thereon as follows:

"1st. The parties' of the first part hereby guarantee to the party of the second part 12 per cent. per annum upon the amount paid for said stock (in lieu of dividends, said corporation paying no dividends) so long as the said party shall remain in the employ of the Merchants' Protective Association, and in addition guarantee the party of the second part salary during said employment as follows:  One hundred dollars per month during the first three months, one hundred twenty-five per month for the next three months; and if the services of the party of the second part are what we hope and expect them to be, the salary will be one hundred fifty dollars per month after the first six months of said employment.

"2d. Should said employment cease through incapacity of the second party, or be terminated by his death, in lieu of the guarantee above given the parties of the first part guarantee to the second party, his heirs, executors, or administrators, eight per cent. per annum upon the amount paid for said stock.

"3d. And the party of the second part hereby agrees during the existence of said employment to work for, and under the direction of, the first parties as attorney at law, and render his best services for the corporation above named; said party

of the second part to turn in to said corporation all law business that he now has, and all law business that may come to him hereafter, and is to have one-half of the net profits of all business that he turns in now. The salary and the guarantee as above set forth to be full compensation for all services rendered and all business that may be turned in to the Merchants' Protective Association hereafter. The salary and compensation, above referred to, to be increased by said corporation from time to time as the increased net profits of the association justifieth, but said salary is not expected to exceed two hundred fifty dollars per month.

4th. The parties of the first part agree that at the expiration of ten years, should the party of the second part want to sell out, that the parties of the first part will purchase back from him the stock which he originally bought, and pay him one-half of what he paid for it, or pay the party of the second part a salary of two hundred fifty dollars per month from that time on.''

The trial was to the court without a jury. Judgment was rendered dismissing the plaintiff's complaint and awarding costs to the defendants. Plaintiff appeals.

On appeal plaintiff assails the findings of fact, conclusions of law, and judgment on the grounds that the same are contrary to the evidence and against law, and the findings and conclusions insufficient to support the judgment. It is also contended the trial court erred in refusing to make findings of fact upon all the material issues raised by the pleadings.

The plaintiff, in the presentation of the case to the court, in his brief makes this statement, predicated on the allegations of his complaint:

''Plaintiff brought this action against the defendants, alleging that on or about the 12th day of December, 1908, at Salt Lake City, Utah, plaintiff and defendants entered into an agreement whereby the defendants sold to the plaintiff five shares of capital stock of the Merchants' Protective Association for the sum of twenty-five hundred dollars ($2,500.00), which was paid; that at the time of sale it was further agreed that the plaintiff should be employed for an indefinite period

for the Merchants' Protective Association at an agreed monthly salary, and that in accordance with said agreement the plaintiff entered into the employment of the Merchants' Protective Association, and remained in their employ until the 1st day of January, 1913, and received a monthly salary according to the terms of said contract.''

There is no dispute between the parties as to the contract having been entered into between them, nor that the plaintiff continued in the employ of the Merchants' Protective Association from December 12, 1908, until January 12, 1913, and that during said period of employment the plaintiff was paid for his services by the defendants as salary a total of $7,318.27, and that in addition thereto the plaintiff received 12 per cent. per annum during said time on the $2,500 paid by him for the five shares of the capital stock of said association. The plaintiff complains, however, that there were false and fraudulent representations made to him by the defendants in the sale of the said shares of stock; that the defendants represented to him that the association had unsettled business in its possession and had claims and judgments on hand for collection amounting to more than $1,000,000, and that the actual value of the stock was more than $500 per share, the price paid for it by the plaintiff, when in truth and in fact the stock was practically valueless. The testimony adduced at the trial shows that at the time the contract was entered into between the parties, and for many years prior thereto, the defendant Francis G. Luke, by an arrangement with the association, received all its profits and the income on the condition that he paid the expenses and liabilities of the association, including salaries of its employees. Under this arrangement with the association the defendant Francis G. Luke, after the plaintiff and the defendants entered into the contract in question, continued to receive all the profits and income of the association during the period of time the plaintiff was rendering his services under the contract. And the record shows that under said arrangement the defendant Francis G. Luke drew from the association, covering the period of plaintiff's employment, approximately $10,000 per annum, and that he paid the

salaries and running expenses of the association. The record, therefore, affords very convincing proof that had it not been for this contract or arrangement between the defendant Francis G. Luke and the association the stock in question would have been of the value plaintiff contends defendants represented it to him to be worth at the time the contract of sale and employment was entered into between the parties and that the stock would have earned for the plaintiff substantial dividends. But under said arrangement no dividends were paid upon the stock of the corporation, and the plaintiff received no profits on his investment in the five shares of stock other than the 12 per cent. per annum paid to him by the defendants during the time plaintiff remained in the employment of the association. It further appears from the record that the defendants are the owners of approximately 85 per cent. of the capital stock of the association; that the arrangement of Francis G. Luke with the association to draw all its profits and income will continue, in all probability, at the pleasure of the defendants. The plaintiff testified that he had no knowledge of this arrangement before or at the time of entering into the contract with the defendants, nor until after he had discontinued his services for the association, and now contends that he should be permitted to rescind the contract entered into between himself and the defendants, and recover the price paid by him to the defendants under the contract for the stock.

The judgment of the trial court is predicated on the findings of fact complained of by plaintiff, to the effect that there was no fraud or misrepresentation on the part of the defendants in making the contract of sale and employment entered into between the parties; that for a long time prior to entering into the contract a lucrative law and collection business had been built up by the defendants in the name of the association controlled and conducted by the defendants; that the business of the association entailed a large amount of litigation and numerous lawsuits, necessitating the continuous employment of experienced attorneys at law, who, by continuous employment, became familiar with the said business and

efficient in conducting its litigation; that the plaintiff at the time of entering into the said contract with the defendants was an attorney at law without practical experience in the said business, and, for the purpose of obtaining permanent employment, entered into the agreement with the defendants so that they might train and educate him and render him useful to them in the said business; that the plaintiff had all the benefits of said contract and all the wages and interest specified therein from December 12, 1908, to January 12, 1913, and that during said time defendants performed all the conditions of said contract on their part; that the plaintiff continued in said services after he first learned, as he claims, that certain representations alleged by him to have been falsely made by defendants were false and that he had thereby been deceived in entering into the contract with defendants, from June, 1912, up to January, 1913, and continued to receive his monthly salary and interest on the $2,500 paid by him for his stock in the association as in the agreement provided, without notifying the defendants or in any way indicating an intention or desire to rescind or repudiate the contract, and that on January 12, 1913, plaintiff left the services of the association without the consent of defendants and refused to longer continue his services; that the plaintiff was informed by defendants and knew of the arrangement between the defendant Francis G. Luke and the association, whereby Francis G. Luke was to draw all the profits and income of the association, and that the stock purchased by plaintiff would not draw any dividends, and that neither of the defendants made any representations to the contrary, and that the plaintiff entered into the contract with defendants without relying on any of the alleged fraudulent representations by defendants in any way.

After very carefully perusing the transcript in this case the writer is convinced that the findings of the trial court are amply supported by the evidence adduced. It is true there is much conflict in the testimony given by the plaintiff and the defendant Francis G. Luke as to what was said and the representations made by the defendant Francis G. Luke (the defendant James A. Luke not participating) concerning the

value of the stock and the condition of the business and assets
of the association, and what plaintiff was to expect under the
terms of the contract of sale of stock and employment of
plaintiff, but it would serve no purpose here to discuss the
testimony, documentary or otherwise. That this court will not
reverse the findings of the trial court unless they are clearly
in conflict with the evidence, has been so repeatedly decided
and so universally adhered to in former decisions that cita-
tions would be superfluous. The documentary evidence alone
affords much substantial and convincing proof that the plain-
tiff upon entering into the contract with the defendants had
knowledge that the stock purchased by him, independent of
his purpose of securing employment with the association and
drawing a substantial salary and 12 per cent. per annum on
his money invested in the purchase of the stock, would be
practically valueless, as testified to by the defendant Francis
G. Luke, until at least the defendant Francis G. Luke might
consent to the business of the association being conducted
along other lines than it was then being conducted.

As a matter of law it is contended by plaintiff that the em-
ployment feature of the contract in question is void for lack
of mutuality. Numerous authorities are cited in support of
this contention, among them the case of *Price* v. *Loan & Trust
Co.*, 35 Utah, 379, 100 Pac. 677, 19 Ann. Cas. 589, wherein it
was held by this court that a contract of hiring not binding
an attorney for a specified period lacked the element of mutual-
ity of obligation and could be terminated at any time at the
will of either party. In the case at bar it will be seen that the
contract in question lacks the same element of mutuality, and
therefore the contract was terminable by either party at will.
The doctrine laid down in *Price* v. *Loan & Trust Co., supra,*
and other cases cited in plaintiff's brief, here applies as to the
right of either party to terminate the contract at will. How-
ever, the rule announced in these authorities, and by the courts
generally, is to the effect that where a contract is in its incep-
tion lacking in the element of mutuality, after performance
it becomes binding. 9 Cyc. 329; *Boles* v. *Sachs*, 37 Minn. 315,
33 N. W. 862; *Pennsylvania Co.* v. *Dolan*, 6 Ind. App. 109, 32

N. E. 802, 151 Am. St. Rep. 289; *McLees* v. *Hall*, 10 Wend. (N. Y.) 426; *Emmett* v. *Reed*, 8 N. Y. 312.

It necessarily follows that the value of the plaintiff's services rendered under the contract was not material, and the failure of the trial court to make a finding as to the reasonable value thereof was not error.

For over four years, and until the plaintiff discontinued his services under the contract in question, the defendants paid and the plaintiff received a monthly salary for his services without any protest or complaint on the part of either that it was not just and adequate payment for the services rendered, and, therefore, under the pleadings and testimony in the case, for the trial court to have made a finding that the services of the plaintiff were worth more or less than that fixed and determined by the mutual consent and arrangement of the parties themselves would have been, in my opinion, not only immaterial, but a senseless thing for the trial court to do.

It is next seriously contended by the plaintiff that with respect to the sale feature of the contract in question, whereby the plaintiff purchased five shares of the capital stock of the association at $500 per share, the same is void, owing to gross inadequacy of the value of the stock and lack of consideration for the price paid therefor by plaintiff.

I have heretofore pointed out that the finding of the trial court that there was no procurement by the defendants of the contract with plaintiff through fraud or misrepresentation on the part of the defendants is amply sustained by the evidence adduced at the trial, and we cannot therefore revise the trial court's finding in that regard. As I view the case, a further finding of the trial court as to the value of the stock purchased by the plaintiff from the defendants would have been, in the absence of fraud, misrepresentation, or some undue advantage taken, an immaterial finding, and would not have in any manner legally affected the conclusions of law and judgment arrived at by the court below. Let us assume, for the sake of argument, that the value of the stock purchased by the plaintiff was practically nothing as compared with the price paid for it. Did the plaintiff not get the very stock he bargained

for? Mere inadequacy of consideration, unattended with fraud, misrepresentation, or unfair advantage, would not permit the rescinding of the contract, and offer plaintiff legal grounds for the recovery of the purchase price. *Upton* v. *Tribilock*, 91 U. S. 45, 23 L. Ed. 203; *Watts* v. *Stevenson*, 165 Mass. 518, 43 N. E. 497; *Hunting* v. *Downer*, 151 Mass. 275, 23 N. E. 832; *Guyer* v. *Warren*, 175 Ill. 328, 51 N. E. 580.

In substance, the case at bar presents this statement of facts: The defendants owned 85 per cent. of the stock of a corporation engaged in a law and collection business. It was managed and controlled by the defendants, and it paid no dividends by reason of a contract with the corporation whereby the defendant Francis G. Luke received all the profits and income from its business. The business conducted required the services of an attorney learned and experienced in its line of work. The defendants offered to sell the plaintiff five shares of their stock for $2,500, on the condition that plaintiff would serve the association as an attorney at an agreed salary, and in addition thereto would pay the plaintiff 12 per cent. per annum on his investment in lieu of dividends so long as he remained in the service, until the expiration of ten years, when, should the plaintiff desire to sell his stock, the defendants would pay to plaintiff one-half of the price paid for it, or pay the plaintiff from that time indefinitely a salary of $250 per month. The plaintiff accepted the defendants' offer, paid for the stock, and entered upon the service. The contract was complied with by defendants in every detail; the plaintiff received the stipulated interest on the price paid for the stock, and his salary as agreed upon and stipulated for during a period of over four years, when he, at his own will, discontinued his employment and commenced this action to rescind the contract with the defendants and to recover the price paid for the stock. True, the plaintiff testified that the defendants grossly misrepresented to him the amount and value of the resources of the association, and concealed from him the fact that the defendant Francis G. Luke was to have the profits and income therefrom, and that he did not discover the alleged deception of the defendants until

the month of June, 1912; but the defendants testified to the contrary, and these issues of fact were found against the plaintiff's contention by the trial court. But even then, and for six months thereafter, plaintiff admits he knew of all the alleged fraud and deceptions practiced upon him by the defendants, yet he continued to receive and accept the benefits of his agreement with defendants for over six months without murmur or protest on his part. Again, the trial court finds, and we think justly, that he may not do that.

The writer of this opinion is convinced, that a very careful reading of the entire record in this action, that the findings of fact and the judgment of the trial court are supported not only by the great weight of the testimony, but that they are in full accord with the plain principles of common justice and fair dealing, and in keeping with every rule of law and equity adhered to and observed by the courts.

The plaintiff based his action for the recovery of $2,500 paid to the defendants for five shares of stock of the association on the grounds of fraud, misrepresentation, and inadequacy of consideration. As to all of these grounds, and more especially the alleged fraud and misrepresentation, it is well to consider not only the conflicting oral testimony of the respective parties given at the trial, but also the indisputable testimony, written and in documentary form, bearing on the question of knowledge, good faith, and fair dealing of the parties.

It first appears that in 1908 the defendants caused to be published in a Salt Lake City daily newspaper the following advertisement, to wit:

"Men Wanted, with two or three thousand dollars, *to learn* to help us in our collection business. The right man can earn a good salary with guaranteed profits. Must be ready and willing to work. 12,000 clients. Largest collection business in the world. Here is an opportunity for a bright young man."

To the above the plaintiff replied by letter to defendants, September 25, 1908, as follows:

"In your advertisement of September 23d, I notice that

you desire a man *to learn* collecting in your firm. Will say
that I am looking for a position in a law firm in S. L., and
would be pleased to take the matter up. Will say, by way of
introduction, that I have degree LL.B. from University of
Michigan, and have had one year's practice of law here. Also,
prior to college work, I was clerk of district court three years.
Have had experience in collecting. Can furnish any no. of
references. Please let me know your terms.''

Defendants replied September 29, 1908:

''As our advertisement stated, we want a party with $3,000.
The reason we insist that he have $3,000 is because we cannot
take a man into business and give him the benefit of all that
it has taken us fifteen or sixteen years to build up, unless we
know he is going to stay.  *  *  *  We guarantee 12% on
the investment, and we will increase his salary in proportion
to the increase of the business year by year, limiting him, how-
ever, to a salary not exceeding $250.00 per month, and guar-
anteeing at the expiration of ten years, *should he want to
sell out, that we will purchase* back from him *the stock he origi-
nally bought and pay him half what he paid for it.*  *  *  *
The stock of the association *is sold* at $500 per share.  *  *  *
*We sell* on the basis of $50,000 valuation. The guarantee of
12% per annum on the investment is made by myself and
brother.  *  *  *  The corporation *does not pay dividends.*
The 12% is a guarantee in lieu of dividends. We expect the
future to be accompanied by a much larger business than we
have had in the past.  *  *  *  The time is fast approaching
when the business is going to be entirely too large for us two
to attend to it properly, and if we expect to perpetuate it and
made it a business of commercial prominence throughout the
United States, we must have help. *We cannot take men in
and educate them as employees unless they are interested.*
*  *  *  If we should take a man in and educate him and
give him the acquaintanceship of 2 or 3,000 of our clients it
would be an excellent start for him and he could immediately
branch off for himself and all our labor would be
lost.  *  *  *''

The plaintiff wrote the defendants November 3, 1908:

"I have been home for about ten days and have been making preparations to accept your offer and come to Salt Lake about the 1st of December.   *   *   *

"I have thought the matter over carefully and am satisfied that it is a good thing and will develop into a good proposition in a few years at least.   *   *   *"

Plaintiff again wrote defendants November 27, 1908:

"I assure you, Mr. Luke, I would like to get in your firm, and I believe it is a good thing, but it may be that the money tendered will be too small to justify you in taking me in. But if you want me tied, of course you would have me in that position.   *   *   *"

The foregoing communications were had between the parties preliminary to entering into the contract sought to be rescinded by plaintiff. They were admitted in testimony by the trial court, and state the undisputed material facts leading up to the contractual relations between the plaintiff and defendants. The italicizing is my own.

The testimony of the plaintiff and the defendants is in conflict as to whether or not the plaintiff was told by the defendants before the contract was entered into concerning the arrangement or agreement between the association and the defendants whereby the defendants were to have all the profits of the association. The defendant Francis G. Luke testified that full explanation was made to plaintiff concerning that matter before the contract was executed. The plaintiff denied that anything was said.

Regarding the $2,500 paid by plaintiff to the defendants for the five shares of stock, the defendant Francis G. Luke testified as follows:

"Q. And was there anything said about his (meaning plaintiff) getting any part of this twenty-five hundred dollars back in case he should quit before the time? A. Yes. In case he should quit before the time he would not get any of it back. He called my attention to that and I said: 'If you want to quit, don't come in. You must satisfy yourself now. That is what you are up here investigating. If you think you want to quit, don't come in. We don't want to bother training

anybody or wasting time. If you simply want to come in and learn what you can learn and then leave us, of course if you leave us you won't get your money, all you would get would be that stock, and you would get nothing on that until such time as the corporation paid dividends.' "

As I have pointed out, for four years and nine months after the plaintiff had entered into contractual relations with the defendants he held his stock, received in lieu of dividends thereon the 12 per cent. guaranty made by the defendants, received his stipulated salary, and had to do in the capacity of an attorney with the business of the association in and out of court. During this long period the business of the association, with which he was of necessity familiar, yielded large profits as it had been doing for years before—the record shows from 1901 to 1912, inclusive, $101,734.64. During the forty-nine months of his service he was in a position to know, and, in my judgment, he cannot now with any consistency say that he was not familiar with the disposition being made of the earnings of the association in which he himself shared in the way of salary and the 12 per cent. paid as a guaranty in lieu of a dividend on his stock. True, the stock of the association had no market value and was not offered nor sold upon the market to others; but it did have a material value in the hands of the defendants and the plaintiff, for their holding it offered them all remuneration, employment, and, as to the plaintiff, a much larger return on his investment in it than is usually had in that class of investments, so long as he chose to remain in the employ of the association. That his severance was a matter of his own free will and choosing he himself must admit. He had absolutely no cause whatever for severing his relations except to subserve his own personal interests. If the affairs of the association and its management were at all questionable, from the very necessity of things he had been and was at all times an actual and benefited participant. Further, the plaintiff cannot escape the fact that for a very long period after he discovered the alleged fraud and deceit practiced upon him by the defendants, of which he now so bitterly complains, he continued his fidelity to the alleged

wrongful machinations of the defendants, reaped the benefits in common with them, and, as his only apology for the faith that was in him, before finally retiring from the business, in a letter to defendants made the following somewhat incongruous statement:

"I do not want to cause any bad feelings any place, and would like to make a peaceable change so that no one will be injured. I know that we have had a hard pull the last year, and I have even hated to ask for my salary because the firm was so hard pressed. I would like to carry out my plans and form a partnership with Barnes and open up offices in this building, and go on taking care of the business of the firm on a fee basis, with the right, of course, to have our own clients and business. My hope is to make such an arrangement so that we will be satisfied. I believe it would be more satisfactory. The firm could have Mathison, or some other attorney, in the office, and give me the work by piece, and pay for what I done, and I would still retain my interest in the business and would give you good work. If this does not appeal to you, maybe you can suggest something that suits us all. I have kind feelings toward you, absolute confidence and respect, but I am determined to place myself on a more independent basis, even if it is necessary for me to leave the institution altogether. Talk with me about it.   G. B. H."

The contractual relations of the parties to this action with respect to each other was a somewhat peculiar one—their relations with the association equally so. While the legal right to sever and discontinue the relationships remained at the will of either party, I am not familiar with any rule of law or equity that would permit the plaintiff to recover from the defendants all or any part of the $2,500 for which the defendants sold and the plaintiff purchased five shares of stock. That part of the contract was executed when the defendants delivered the stock to the plaintiff and the plaintiff paid the defendants the agreed price therefor.

Nor do I think common justice or fair dealing between man and man would sanction or permit of the plaintiff's recovery from the defendants the price paid for the stock under the

facts and circumstances disclosed by the record in this case. That the plaintiff fully considered and understood the purpose of the defendants in requiring him to purchase the five shares of stock as a prerequisite and necessary condition of his employment is made plain by the written communications between the parties before the contract was executed by the plaintiff. His legal training, his previous experience with the courts, and actual though limited practice as an attorney, must certainly be held to have sufficiently qualified him to appreciate the character of the business in which he was about to engage with the defendants, and that they could ill afford to engage his services without requiring him to purchase and pay for the stock as an evidence of good faith. That the defendants have delivered to the plaintiff just exactly what he bargained for the record here is absolutely conclusive. The plaintiff has kept and held the stock and partaken of the benefits of his transaction with the defendants for nearly five years. He has discontinued his services under the contract for the furtherance of his personal interests alone. He is now to engage in the same kind of business with another. The law permits him to do that, but in all good conscience will law or equity permit him at the same time to take with him not only the benefits of his relationship with the defendants under contract, but the price he was in the beginning so anxious and willing to pay in order that he might be placed in a position to enjoy the opportunities and reap the benefits the contract so long afforded him? As to that feature of his contract the same, in my judgment, must be held to have been fully executed when he purchased and paid for the five shares of stock, and therefore I cannot escape the conclusion that the judgment of the trial court was right and should be affirmed.

In view, however, that a majority of this court has arrived at a conclusion that the findings and judgment of the district court should be modified in accordance with the views expressed by them, the findings of fact and conclusions of law of the district court are hereby modified, and judgment is ordered to be entered as stated in the following opinion of the Chief Justice.

FRICK, C. J.

While the majority of the court agrees in the statement of facts made by Mr. Justice CORFMAN in the foregoing opinion, and for the purposes of this opinion adopts the same, yet we do not concur in the reasoning of nor in the conclusions reached by him, and therefore do not concur in the affirmance of the judgment. On the contrary, the majority of the court is of the opinion that the findings of fact, conclusions of law, and judgment should be modified as herein stated for the following reasons:

As appears from the statement of Mr. Justice CORFMAN, the action was commenced by the plaintiff to rescind the contract which is set out in full in the foregoing opinion and to sever the relations thereby created between him and the defendants. By reference to the complaint, the substance of which is stated in the opinion of Mr. Justice CORFMAN, it will appear that the plaintiff fully recognized the underlying principle which controls in such an action, namely, that he who seeks equity must do equity. In conformity with that principle he, therefore, offered to return the five shares of stock and in that way attempted to restore the status quo. When doing that, he, however, entirely overlooked or ignored the very tenor and purpose of the contract from which he sought to be relieved. The contract was not one merely for the purchase and sale of the five shares of stock mentioned therein, but it contained several other important features. Indeed, a mere cursory reading thereof convinces the writer that the purchase of the five shares of stock was a mere incident, and that the principal purpose of the contract was to establish the relationship of the parties as therein stated. Everything that is said in the contract, and all that was done by either of the parties pursuant thereto, clearly shows that the five shares of stock merely figured in the transaction as a basis for the payment of the $2,500 by plaintiff to the defendants. It is also clear that, in truth and in fact, the payment of that sum of money was not intended as consideration for the five shares of stock, but as an inducement for the plaintiff to continue the relationship created by the contract for the

period contemplated, though not expressly stated therein, to wit, ten years.

In view, however, that the period of time that the relationship should continue was not stated in the contract, neither party was bound to continue the relationship for any definite period, but could terminate the same at any time. This is also the conclusion reached by Mr. Justice CORFMAN. The plaintiff also insists that such is the case, while, as appears from Mr. Justice CORFMAN'S opinion, the defendants in their answer aver that the contract for some reason was against public policy and therefore void. Mr. Justice CORFMAN, however, arrives at the conclusion that the portion of the contract relating to the purchase and sale of the five shares of stock was fully executed and for that reason he refuses plaintiff any relief. We are all agreed, however, that the contract, so far as it related to the employment of plaintiff, was partly executed, and, to the extent that it was executed, both parties have received the benefits provided for therein.

As before stated, it is palpably clear, however, that the thing which induced the parties to enter into the contract was that the plaintiff should be employed as attorney in defendants' collection business for a period of ten years, at the salary specified in the contract, and upon the conditions therein stated, and that as an inducement to plaintiff to continue in that employment he was to take the five shares of stock and pay to the defendants the $2,500. Each party, therefore, obtained something from the other upon the implied understanding that the relationship created by the contract should continue for a certain period of time. It was for that reason that it was agreed that plaintiff should be paid and was paid 12 per cent. interest annually on the $2,500 and the defendants received that sum of money from him. The facts, therefore, that the parties failed to enter into a contract which was legally enforceable respecting the relationship for the full period of time contemplated, and that the contract has only been partly performed, are sufficient reason why, in equity and good conscience, neither of them should retain

the fruits of the contract, which could only rightfully be demanded in case of full performance. The relationship which was to continue ten years being severed before one-half of that period had elapsed, both parties should be required to do equity, and neither one should be permitted to obtain an undue advantage over the other in retaining the fruits of the contract, which were only to be received in case it was fully performed as contemplated by the parties. The mere fact that neither party can in law enforce the contract or sue to recover damages for a breach thereof is no reason why either one in equity should receive the fruits as though the contract had been fully performed. To allow that would be equivalent to allowing damages for a breach of the contract. So far as the contract of employment was executed, plaintiff has received full compensation by being paid his salary, and the defendants also have received full consideration by receiving the services rendered them by the plaintiff. It may be observed, however, that if the plaintiff had continued the relationship for the full period of ten years, and had rendered services to the defendants for that length of time, if he then desired to discontinue the relationship he could return the five shares of stock and receive the sum of $1,250 from the defendants therefor. Under the judgment as it now stands, the defendants are left in a much better position than they would have been if the contract of employment had been fully performed as contemplated by the parties. The judgment proposed by Mr. Justice CORFMAN is equivalent to enforcing the contract against the plaintiff and excusing the defendants from doing equity. The view that the contract was not enforceable and was not fully performed should not operate to permit the defendants to reap the fruits as though it had been fully performed. Under the proposed judgment the defendants are permitted to retain the full $2,500, which under the circumstances of the case, in my judgment, is clearly and manifestly inequitable and unjust.

Upon the other hand, the plaintiff not only seeks to retain the full amount of the salary paid him, but also demands that defendants pay him back the $2,500, with

legal interest from the time they received it. To award that to him would, in my judgment, be equally unjust and unfair. As we have seen, he paid that sum in part consideration of being paid a larger salary and of being permitted to enter upon the employment for a definite period of ten years, which, in the nature of things, must have been of material benefit to him. In view of all the circumstances, therefore, the only question is what judgment should be entered in this case.

The defendants now have in their possession the $2,500 which the plaintiff paid them in entering upon the employment as attorney for them. As we have seen, the plaintiff paid the $2,500 voluntarily and for the purposes before stated, and the defendants, therefore, had the legal right thereto, at least while the plaintiff continued in the employment and discharged the duties as an attorney for them, and until he tendered back the stock and demanded repayment of the money, which he did on the 13th day of January, 1913. From the time the defendants received said $2,500 until the 13th day of January aforesaid they had, however, paid the plaintiff the 12 per cent. interest mentioned in the contract, and which it is clear was agreed to be paid in contemplation that plaintiff should remain in defendants' employment for the full period of ten years. The amount so paid amounted to the sum of $1,017.22. The plaintiff would not have been paid that amount, or any part thereof, if he had indicated that he would not continue in the employment for the full period contemplated by the parties. In equity and good conscience, the plaintiff should not be permitted to retain said sum of $1,017.22, and the defendants should be given credit therefor on said $2,500. If that be done, the defendants owe the plaintiff the sum of $1,482.78 on said $2,500, with legal interest on the latter sum from the 13th day of January, 1913. The defendants are entitled to the return of the five shares of stock. Any other result will permit either one or the other of the parties to enjoy the fruits of the contract as though it had been fully performed, when in fact it was only partially performed, and was unenforceable not because of the wrongful acts of either, but by reason of the inadvertence of both. The

parties being in a court of conscience, neither should be permitted to gain an advantage over the other.

In my judgment the foregoing conclusions are supported by all the authorities. Here each party obtained something from the other in contemplation that a certain business relationship should continue for a specific length of time under certain conditions. The relationship was, however, severed before the time contemplated had elapsed, and before all that was contemplated by the parties was fulfilled, and the parties are now in a court of equity, seeking to adjust the differences between them which grew out of the relationship before stated. Being in a court of equity, they must do equity. The maxim applies regardless of the nature of the controversy or of the reasons why the parties have severed their relationship. In 9 C. J, 1209, in referring to the application of the rule, it is said:

"And the rule is the same in respect to both real and personal estate, and applies irrespective of the grounds on which cancellation is sought. Thus, it applies to fraud, mistake, duress, nonperformance, illegality, or want of consideration."

Regardless of the cause why a contract is not fully performed as contemplated when it was entered into, the maxim applies, and neither party will be permitted to retain anything which would be inequitable and unjust under the circumstances.

The judgment, therefore, is reversed, and the cause is remanded to the district court of Salt Lake County, with directions to modify the findings of fact and conclusions of law in accordance with the views herein expressed, and to enter judgment as herein directed. Appellant to recover costs.

THURMAN, J.

Three opinions in this case have already been written and filed by my Associates. There is scarcely room for another; therefore this effusion need not be dignified as an opinion. The case is sui generis. There has never been another like it in the annals of litigation. In all human probability there will never be another while time endures. Therefore the haunting

dread of a dangerous precedent that may come back to plague us has no place in the case at bar. If any opinion written in this case should ever be cited as authority in any other it can easily be distinguished. The sole duty, therefore, developing upon the court is not to attempt to lay down a rule for future cases, but to dispose of the case before the court on its own peculiar facts, without reference to any thing that may happen hereafter.

While not agreeing with Mr. Justice CORFMAN entirely in his statement of the facts, nor with the CHIEF JUSTICE in so far as he agrees with Mr. Justice CORFMAN, still I am of the opinion the CHIEF JUSTICE has arrived at the only equitable solution of the problem. Under the circumstances, Luke should be credited with whatever sum Hancock received as interest on the $2,500 down to the time he severed his relation and made demand for the money, and Hancock is entitled to judgment for the remainder and legal interest thereon from the date of the demand, together with his costs.


GIDEON, J.

I concur in the conclusions reached by the CHIEF JUSTICE and Mr. Justice THURMAN.


McCARTY, J.

This case was before this court on a former appeal. 46 Utah, 26, 148 Pac. 452. The members of the court did not agree as to the propositions of law on which the case should be ruled and determined. Two of the members were of the opinion that the case should be reversed with directions. The dissenting member was of the opinion that the judgment of the trial court should be affirmed. The present Chief Justice wrote the prevailing opinion, which was agreed to by Mr. Justice Straup, then Chief Justice, in a concurring opinion. The dissenting member of the court took the position that the contract in question was terminable at will by either party, and that the allegations of the complaint charging fraud and fraudulent representations should be treated as matter of

inducement only, and the prayer that "the contract should be canceled" as redundant, as "neither the proof of the one nor the granting of the other is a prerequisite to plaintiff's right to recover." See dissenting opinion, 46 Utah, 44, 148 Pac. 452. Neither of the other two members of the court at that time agreed with the dissenting member as to either of these propositions. The present Chief Justice, in a somewhat elaborate opinion reversing the case, said:

"In this connection it should be remembered that the plaintiff in his complaint shows that he continued for a period of more than four years to enjoy all the benefits of the contract he now seeks to repudiate. Let it be conceded, therefore, that the contract is unenforceable, yet it does not follow from that alone that either of the parties, after receiving the fruits thereof, may not in equity be required in some form to account to the other party."

The then Chief Justice, in an opinion concurring with Mr. Justice Frick, said:

"And then to entitle him (Hancock) to recover on his alleged theory of repudiation and rescission, and on his alleged grounds of fraud and misrepresentations, and to be restored to what he in pursuance of the contract paid out, he must himself do equity, and account for or offer to restore what, if any, benefits he himself received on part performance and in pursuance of the contract. * * * It may be that what he received by way of salary is balanced by services rendered by him, that by way of dividends by interest on the money paid out by him, and hence, on a rescission of the contract, equity would not require restoration on his part, further than contained in his offer, a surrender of the certificate. But it is better to adjudicate than to assume that."

The concluding part of the opinion written by the present Chief Justice, in so far as material here, is as follows:

"The judgment is * * * reversed, and the cause remanded to the district court, * * * with directions to set aside the judgment and to proceed with the case as herein suggested, * * * and to make such disposition thereof as in his judgment the law and the facts require, and in accordance with the views herein expressed."

The law as thus declared in the two prevailing opinions on the former appeal, whether sound or unsound doctrine, became and is the law of the case, and this court, as well as the trial court, is bound thereby.

The case, on being remanded, was tried by the trial court in accordance with the views expressed in the two prevailing opinions. The court, however, did not make any finding respecting the value of the services rendered by Hancock while he was in the employ of respondents, but found against him on the other issues, and entered judgment dismissing the action.

I am clearly of the opinion that the court erred in not finding on all of the issues in favor of Hancock.

The substance of the contract over which the controversy arose is set out in the dissenting opinion (46 Utah, 43–44, 148 Pac. 459), and is copied in full in the opinion of Mr. Justice CORFMAN filed herewith; hence it is unnecessary to incorporate it in this opinion.

The record shows that preliminary to making the contract considerable correspondence, which extended over a period of more than two months, was carried on between Hancock and the defendant Francis G. Luke in relation to the subject-matter of the contract. Hancock, at that time, resided in Panguitch, a small town in the southern part of this state, where he was, and for about a year had been engaged in the practice of law. Luke proposed to Hancock that if he would come to Salt Lake City, and purchase a certain number of shares of the capital stock of the Merchants' Protective Association, hereinafter called association, at $500 per share, they (the Lukes) would employ him on a monthly salary to take charge of and transact their legal business. Luke, in a letter to Hancock bearing date of September 29, 1908, said:

"We are paying out perhaps three to five hundred dollars every month for legal work, and there is an opening in this office for an attorney who likes work and who has ability. * * * We guarantee 12% on the investment, and we will increase his salary in proportion to the increase of business year by year to a salary not exceeding $250 per month. * * * We will collect this year about $200,000. We are doing business for 12,000 clients."

Regarding the financial condition of the association and the value per share of its capital stock he stated in his letter:

"The stock of the association is sold at $500 per share. There are only 100 shares altogether. The business is worth $100,000, but, in selling to a party who comes in with us, we sell on the basis of $50,000 valuation. The guarantee of 12% per annum on the investment is made by myself and my brother James A. Luke, who own all of the corporation with the exception of about ten shares. The corporation does not pay dividends. The 12% is a guarantee in lieu of dividends."

Hancock came to Salt Lake City, and on December 9, 1908, met and conversed with Francis G. Luke in relation to the business mentioned in the correspondence referred to. He testified that Luke, on that occasion, said that the capital stock of the association was worth $500 per share; "that the Merchants' Protective Association owned judgments amounting to a million dollars, which could and would be collected; that the Merchants' Protective Association * * * had a reserve fund in McCornick's Bank amounting to $10,000"; and that he (Hancock) believed these representations to be true.

Mark E. Waddoups, a director of the association, was called as a witness by Hancock, and testified that he became connected with the association in a business way about the same time that Hancock became identified with it; that he became a stockholder, and commenced working for the association in January, 1909, and became a director December 18, 1911; that at the time he purchased his stock Francis G. Luke stated to him that the capital stock of the association "was worth on a basis of $50,000," and that it was "in excellent standing with McCornick Banking Company, and the [it] had amounts of money on deposit of large sums"; that he (Waddoups) "had charge of the cash deposited and drew checks" for the association. The evidence of Waddoups is not disputed in any particular.

Luke testified that "when the contract with Hancock was made, and on that same day, there was on overdraft which was more than $600"; that he stated to Hancock that "the stock was of small or no market value." He stated on cross-examination that "the property and assets of said corporation have always been of small value."

The evidence referred to is all but conclusive that Luke, as an inducement to Hancock to purchase the stock, represented to him that the intrinsic value of it was more than $500 per share, and that he intended to, and did, lead Hancock to believe that the market value of the stock was at least $500 per share. In his letter to Hancock, bearing date of September 29, 1908, he stated, as I have pointed out, that "the stock of the association is sold at $500 per share. * * * The business (stock) is worth $100,000, but in selling to a party who comes in with us we sell on a basis of $50,000 valuation." We think the only reasonable inference or conclusion deducible from this language, if true, is that the value of the capital stock of the association was $500 or more per share. The record shows, as we have pointed out, that Luke make substantially the same representations to Waddoups that he made to Hancock respecting the assets of the association and the value of the stock per share, and thereby induced Waddoups to purchase a block of the stock at $500 per share. The evidence is undisputed that Luke stated to Waddoups that the association was in excellent shape financially, and that it had large sums of money on deposit in McCornick & Co.'s bank about the time Hancock claims Luke made substantially the same statements to him respecting the amount of the association's bank deposits. Luke, on cross-examination, admitted that the association, instead of having money on deposit in the bank, at that time had overdrawn its account at the bank and was indebted to its clients in the aggregate of $3,000. This was also, in effect, an admission that his representations regarding the assets and general financial condition of the association, at the time the transactions referred to were had were false. The claim made by Luke that he (after having devoted much time, which extended over a period of more than two months, in inducing Hancock, by false and fraudulent representations, to enter into the contract in question) informed him, just before the contract was signed, the stock therein mentioned, which he (Luke) represented to Hancock to be of great value, was practically worthless, and that Hancock, notwithstanding this confession of fraud and chicanery

on the part of Luke, signed the contract, has the insignia and all the earmarks of a silly falsehood. In fact, no intelligent person can read his testimony in this case, as the same appears in the bill of exceptions, without becoming convinced that in business transactions Luke is both shrewd and unscrupulous, and that he can utter a falsehood and play the rôle of crook with the same equanimity and peace of mind that he can speak the truth and act honestly in his business dealings. It would seem from the record that he regards all business transactions as games of chance, and that his motto is "heads I win, tails you lose," and that in this, to him, game of chance the "end justifies the means." I think the record clearly shows that he obtained Hancock's money ($2,500) by false and fraudulent representations, and by the flimsiest of falsehoods in trying to perpetually retain it.

The trial court, in the face of the direct and positive statements of Luke contained in his letter to Hancock of September 29, 1908, that "the stock of the association is sold at $500 per share," etc., and Waddoups' undisputed evidence that Luke stated to him that "the stock was worth on a basis of $50,000," found "that neither of the defendants at any time represented or stated to plaintiff that the stock of said corporation had an actual value of $500 per share, or any actual value whatever." It is needless to remark that this finding of fact cannot be upheld, as it is contrary to all the evidence in the record that has any bearing whatever on that particular point. The court also erred in its decision wherein it held "that neither of said defendants made any representations or statements whatever to plaintiff that were false or untrue, and that plaintiff was not misled or deceived in any way by any statement or representations, at any time, made by defendants, or either of them, to plaintiff."

Hancock has received practically no consideration whatever for the $2,500, except the interest paid him on the so-called "investment." As pointed out, the evidence conclusively shows that the stock "was (and is) of small or no market value." Luke testified on this point in part as follows:

"What I mean to say is that it (the stock) does not have

any market value.  *  *  *   Q. You could not sell it on an open market at all? A. No.   Q. It does not have any value? A. No."

The record shows that forty-six shares of the stock were sold at sheriff's sale on the 21st day of March, 1904, for $350, which was a little in excess of $7.60 per share.

The respondents, if we correctly understand their position, seek to justify their retention of the money ($2,500), and to bolster up their defense to the action, on the ground that the salary they paid Hancock in the aggregate exceeded the value of the services rendered by him, during the time he was in their employ, in a sum equal to, if not greater than, the amount he is seeking to recover by this action. The evidence, without conflict, shows that during the forty-nine months that Hancock was in the employ of the respondents under the contract, the total amount paid him as salary was $7,318.27, an average of approximately $149 per month. It will thus be observed that Hancock rendered services for $149 per month that Luke, in his letter to Hancock of September 29, 1908, stated were then costing the association from $300 to $500 per month. The evidence, without conflict, shows that Hancock, during the time he was with the Lukes, "did practically all the law business for the association," and that he "appeared in three thousand cases in the city courts, and (appeared) many times in the district courts and other courts." Waddoups, who, as stated, was a director of the association, and whose business was to receive claims and make a record of them, testified, and his testimony is not disputed, that Hancock "was in court a great deal of the time and that there was no complaint about his services while employed." J. J. Whitaker, formerly a judge of the city court of Salt Lake City for eight years, testified that from 1908 until he left the bench he "saw Mr. Hancock in court nearly every day, and observed his conduct as a lawyer. My judgment is that he handled the cases as well as any other lawyer could have done. Hancock's services were reasonably worth from $75 to $100 per week." Three other attorneys of integrity and recognized ability were called as witnesses. One testified:

·"I know the parties, and have observed George B. Hancock in his legal work while he was employed by the Merchants' Protective Asociation. A salary of $149 per month for forty-nine months would not be unreasonable."

Another testified:

"I know the parties, plaintiff and defendant. * * * Assuming that Mr. Hancock worked as attorney for the defendants for forty-nine months, and during that time took care of about three thousand cases in the city court and a number of other courts, and attended to all trials, motions, legal questions, and supplementary proceedings, and received therefor as compensation $149 per month, in my judgment he would have been underpaid."

The other attorney testified:

"I am acquainted with the plaintiff and defendants. Have observed the legal work done by Mr. Hancock while in the employ of the defendants. Assuming that Mr. Hancock was employed for forty-nine months, and during that time took care of and handled for defendants about three thousand cases, involving all motions, trials, and supplementary proceedings, his services would be reasonably worth $300 per month."

To refute this evidence, which is of the most reliable and convincing character, Francis G. Luke testified that Hancock's services were worth from $20 to $100 per month, and at no time during his employment did they exceed in value of $100 per month. The great preponderance—the overwhelming weight —of the evidence shows that Hancock was not paid what his services were reasonably worth. The defendants, therefore, have wholly failed to establish their claim to a recoupment or set-off on the ground that the sum they paid Hancock as salary was more than his services were reasonably worth.

The evidence shows that at the time the contract in question was executed Francis G. Luke was, and for several years had been, entitled, under a written contract which he had with the association, to all the earnings, income, and profits of the association. The contract is to exist and continue during the pleasure of Luke. On cross-examination Luke testified:

"Q. The association served the purpose of a mere conduit or drain, to so speak, by which the money flows through to you? A. That is right. Q. But the ultimate source was your pocket or your private banking account, wasn't it? A. Yes, sir."

He further testified that he did not know who the directors are; some of whom failed to qualify as such. It is therefore clearly made to appear that the association is a corporation in name only. The directors, if any there are, have nothing whatever to do with the business transacted in the name of the association. The record shows that when accounts are sent to or left at the office for collection they are received and a record made of them in the name of the association. Actions to recover on the accounts were ostensibly brought and prosecuted to judgment by the association under the direction and supervision of Francis G. Luke as president and business manager. It is manifest that the name of the association is used by the respondent to solicit business, and as a buffer or shield to protect them from personal liability for any alleged dereliction or delinquency on their part amounting to a legal wrong in transacting business with or for their numerous clients. This method of soliciting and transacting business for themselves as individuals in the name of the association is a fraud against the public. People are led to believe that they are intrusting their business to, and transacting business with, the corporation, when in truth and in fact they are dealing with Francis G. Luke as an individual, and with him only. Hancock testified that he was not advised of Luke's contract with the association, and that the concern had thereby become a mere dummy only, the name of which was being used by Luke to solicit and transact business for his own individual benefit, until June, 1912. The record shows that at that time a check drawn in Hancock's favor by, or in the name of, the association in payment of his services was dishonored and payment refused by the bank on which it was issued. He inquired of Waddoups, who made out the check, why it was not paid. Waddoups informed him that the account carried in the name of the association at the bank was overdrawn. Han-

cock then inquired of Waddoups about the reserve fund of
$10,000, which he claims Luke stated to him, at the time the
contract in question was executed, the association had on de-
posit in the bank, and was informed there was no such fund.
On further investigation he discovered that the association
was indebted to numerous clients for money which it had
collected for them. He testified, and his evidence is not dis-
puted, that he "learned this from seeing forty or fifty checks
made out to clients that were held for over a year." Wad-
doups testified, and his evidence is not disputed, that the
records kept by him in the name of the association show that
in June, 1912, the association was indebted to clients for
money collected for them from $8,000 to $10,000, and that its
account at the bank was overdrawn $6,700, which overdraft
was then covered by Luke's note to the bank. Under these
circumstances, I submit that Hancock was morally and legally
justified in rescinding the contract and terminating his con-
tractual relations with respondents.

The question of whether Hancock was guilty of laches, and
waived any right he may have had to rescind the contract on
the ground of the false and fraudulent representations re-
ferred to, by continuing in the employment of the defendants
for approximately six months after he discovered the fraud,
was not an issue in the case. The trial court, however, in its
findings of fact, made it an issue, and found against Hancock
on the question of waiver. Respondents, in their printed
brief, say:

"But assuming that the respondents practiced fraud, the
appellant waived it by receiving benefits under the contract for
a period of more than seven months after he confessedly dis-
covered the fraud."

Ordinarily the taking of benefits under a contract, and
silence and inaction on the part of the defrauded party for a
period of six or seven months after he has knowledge of the
fraud, is deemed a waiver of the fraud and a ratification and
affirmance of the contract. Hancock, however, was confronted
by an unusual and extraordinary combination of circum-
stances when he discovered the fraud. He was, and had been

for more than three years, in charge of the legal business of
the association; and it may be fairly inferred from the record
that the association, at that time, had much business, with
which Hancock was familiar, undisposed of and pending be-
fore the courts. The association was indebted to clients for
money collected in sums aggregating from $8,000 to $10,000,
and was indebted to its bank in the sum of $6,700. The re-
spondents had $2,500 of his money. The record shows, and
Hancock knew, that the assets of the concern consisted entirely
of the good will of the business and the accounts turned over
to it for collection by its numerous clients. Under these cir-
cumstances, Hancock was justified in proceeding with caution
and deliberation before severing his relations with the re-
spondents.

"Waiver is a voluntary act. What one does in a dilemma forced
upon him by the default of another cannot be counted upon as a waiver."
40 Cyc. 259.

Furthermore, the record shows that the respondents, instead
of being injured by the delay, were benefited thereby. Francis
G. Luke testified:

"Q. I understand, from your answer and from your gen-
eral attitude in this case, that you are displeased because he
(Hancock) quit? A. Yes, sir. Q. * * * You feel that
you suffered some injury? A. Well, I should say so."

I am clearly of the opinion that Hancock, under the circum-
stances, did not, by the delay, waive any right he may have
had to rescind the contract on the ground of fraud. More-
over, the defalcations herein referred to on the part of the
Lukes, and the association in their dealings with their clients,
were, as a legal proposition, alone sufficient to justify Han-
cock in terminating the contract and severing his relations
with these parties, regardless of the time that may have
elapsed after he became advised of their defalcations.

On January 12, 1913, Hancock gave respondents written
notice of his intention to terminate the contract of employ-
ment. Respondents introduced the letter in evidence. They
insist that this "evidence sufficiently discloses that appellant
did not quit the service of the association, nor repudiate the

contract, because of the alleged fraud.'' The letter, so far as material here, reads:

''The matter which I sprung in the meeting the other night was not done because I wanted to be too assuming and I do not think the firm can afford to pay me what I ask. * * * I do not want to cause any bad feelings any place and would like to make a peaceable change so that no one will be injured. I know that we have had a hard pull the last year, and I have hated to ask for my salary because the firm was so hard pressed.

''I would like to carry out my plans and form a partnership with Mr. Barnes and open an office in this building and go on taking care of the business of the firm on a fee basis, with the right, of course, to have our own clients and business. My hope is to make such arrangements so that we will all be satisfied. I believe it would be more satisfactory. The firm could have Mathison or some other attorney in the office and give me the work by piece, and pay me for what I do, and I would still retain my interest in the business and would give you good work. If this does not appeal to you, maybe you can suggest something that suits us all.

''I have a kind feeling toward you—absolute confidence and respect—but I am determined to place myself on a more independent basis, even if it is necessary for me to leave the institution altogether. Talk with me about it.''

The letter is in the nature of an offer or compromise, and, under the circumstances, is in no sense a ratification of the fraud practiced on him by respondents when the contract in question was executed. The letter shows a desire on the part of Hancock to effect an amicable settlement with respondents of their business relations and affairs in such a way as to prevent, if possible, loss or injury to either party. In considering the letter we should take into account the circumstances and conditions with which Hancock was confronted respecting his business relations with respondents as well as the object he had in writing it. When Hancock, in June, 1912, discovered the fraud complained of, the association, as I have pointed out, was indebted in sums aggregating about $20,000,

and it had no means or money on hand with which to liqui-
date any part of it.  Seven months later, when the letter was
written, much of the indebtedness had been paid, but the
association was still quite heavily involved.  The letter indi-
cates that the association was, and for a year had been, some-
what financially embarrased.  Hancock no doubt felt, judging
from the tone of the letter, that it would be better for all
parties interested if some satisfactory arrangements were
made so that it would not be necessary for him to further em-
barrass respondents and the association by demanding imme-
diate payment of the money respondents were owing him.
We think the record clearly shows that.  When the check
drawn in favor of Hancock by the association was refused
payment by the bank on which it was drawn, and he dis-
covered that respondents had used for their own purposes
from $8,000 to $10,000 that had been collected by or in the
name of the association for its clients, there were three ways
open to him to meet the situation: (a) The course he has
taken in the matter.  (b) He might have closed his eyes and
remained silent as to the condition of the business affairs of
the association and continued in the service interminably or
during the pleasure of the respondents.  (c) He could have
had respondents charged with and prosecuted for embezzle-
ment, and thereby have sacrificed—lost—the entire $2,500 in
question, and probably have so upset or disarranged the busi-
ness affairs of the association that it would have been impos-
sible for it to have liquidated any part of its indebtedness.

We think the only theory upon which it could be held that
Hancock is not entitled to equitable relief is that he com-
pounded a felony by not having respondents prosecuted for
embezzlement, and to that extent came into a court of equity
with unclean hands.  This, however, is an angle or feature of
the case that was not, and is not, made an issue.

The contract contains no promise or agreement on the part
of Hancock that he will remain in the employ of the associa-
tion any definite period of time.  Nor does it contain a promise
on the part of the Lukes that the association will employ Han-
cock for any specific length of time.  And even if it did con-

tain a covenant to that effect, the contract would be unenforceable against the association. The association was not a party to the contract, nor was the contract made and executed on behalf of the association. The provisions of the contract relating to the question of employment are, so far as material here, as follows:

"The parties of the first part hereby guarantee to the party of the second part 12 per cent. per annum upon the amount paid for stock,   *   *   *   so long as the said party shall remain in the employ of the Merchants' Protective Association, and in addition guarantee the party of the second part salary during said employment.   *   *   *   And the party of the second part hereby agrees during the existence of said employment to work for and under the direction of the first parties as attorney at law and render his best services for the corporation above named."

Assuming, for the sake of argument, that respondents made and executed the contract on their part for the benefit of the association, as well as for their own benefit, no action was ever taken by the association by resolution or otherwise, to ratify what the respondents had done in that regard. The association, therefore, is, in a legal sense, a stranger to the contract. Respondents could have dispensed with Hancock's services at any time after he entered their employment without breaching the contract or incurring any liability whatever. And, as the contract does not provide that Hancock shall remain in the service of the association for any specified period of time, it necessarily follows that he could sever his relations with the respondents at any time without violating any, of its provisions. In other words, the contract was terminable at will by either party. Assuming, for the sake of argument only, that it may be implied from the contract that Hancock was to continue in the service of respondents for the term of ten years, the contract is, nevertheless, unenforceable, because the respondents were not bound to continue Hancock in their employ for any definite period of time. As stated, they could have terminated the contract and dispensed with Hancock's services at any time after the contract was executed

without breaching it. The contract, therefore, lacked mutuality. The case, we think, falls clearly within the rule announced in *Price* v. *Western L. & T. Co.*, 35 Utah, 379, 100 Pac. 677, 19 Ann. Cas. 592. Respondents, in their "Second amended answer"—the answer upon which the case went to trial—alleged "that the said contract so made and entered into between plaintiff and defendants is a contract against public policy and is unlawful and void." This answer Francis G. Luke verified under oath, and he admitted while testifying as a witness in the case that his attention was directed to the foregoing allegation of the answer before he made the verification. It being thus conceded that the contract is "unlawful and void," ought to settle the question of Hancock's right to terminate it without being penalized therefor. Furthermore, it being a contract that was terminable at will by either party at any time, the question of whether Hancock was induced to enter it through the fraudulent representations alleged in his complaint, and the question of whether he waived his right to rescind it because of such representations, are not decisive of the case; the evidence relating to these questions is in fact of no importance whatever except as it tends to reflect the history of the case, and tends to show that the equities are not, as the trial court seemed to hold, all with the respondents.

That the stock received by Hancock in the transaction under consideration was and is of no appreciable value is too plain to admit of serious discussion. In respondent's original answer filed in the case, which was admitted in evidence, it is alleged—

"that before and at the time of the execution of said agreement the defendant informed the plaintiff that such stock was of *small or no intrinsic value,* and informed him that their purpose in requiring the purchase of the same was *not in any sense to make him a partner in the business, but a pledge in guarantee* that he would not, after a comparatively brief period in their employ, * * * quit the service of the defendant. That the plaintiff understood that *he was not and would not be directly interested in the business of said cor-*

*poration, or in the profits of the same, whether as dividends or interest, or by whatever name they might be called,* \* \* \* and (plaintiff) accepted the personal covenants of the defendants to pay him the monthly salary stipulated for in said agreement, and to pay the interest on the $2,500 so invested by the plaintiff." (Italics ours.) That the defendants "required of the plaintiff, as a condition of such employment, and particularly as an earnest, that he purchase five shares of the capital stock of the \* \* \* association, at the price of $500 per share, and the said defendants agreed to pay interest on said purchase price during the continuance of the agreement." It is further alleged that "the capital, property and assets of said corporation have always been of small value."

This answer was verified by Francis G. Luke under oath. And he testified that he helped draft—prepare—it. He therefore was advised as to the matter therein contained. In his second amended answer, which he also verified, it is alleged that "said corporation was largely engaged in the business of practicing law." He admitted while testifying that the brief filed in this court by himself, and codefendant on the former appeal of this case (*Hancock* v. *Luke,* 46 Utah, 26, 148 Pac. 452) contained the statement that "the $2,500 was paid under the *guise* of the purchase of five shares of stock." And that he (Hancock) accordingly bought his way into the practice of the law, not by paying a lump sum outright, but by turning in on halves what business he had on hand, and *"by the payment of $2,500 in the nature of a loan, on which he received twelve per cent. interest."* (Italics ours.) He also testified that he authorized the printing of the briefs, but stated that he now repudiates the statement last quoted.

Ordinarily, a litigant—party—to an action will not be held accountable for, nor be bound by, statements of fact respecting the merits of the controversy made by his attorneys in their behalf. Respondents, however, are in a situation somewhat different than in which litigants are usually placed. They alleged in their answer, and Luke testified, that in connection with the collection business the "corporation was largely engaged in the business of practicing law." The

record shows that the business of the association, including that of the legal department, was under the personal super-vision of Francis G. Luke. The evidence also shows that he (Luke) has been personally engaged somewhat extensively in the trial of cases for the association before the inferior courts of this state. In this case Luke, who is personally sued for $2,500 and interest thereon, having assisted in preparing the answer filed in the action, and having authorized the printing of the brief, we think the conclusion is irresistible that he must have known and approved the matters contained therein before it was filed. While the quotations from the brief are not of controlling importance, they, nevertheless, tend to show that respondents regarded the $2,500 in the nature of a loan, and not as proceeds of the sale of the five shares of stock to Han-cock. The quotations from the original answer herein set forth show that respondents did not intend that the transfer of the five shares of stock to Hancock should carry with it any property rights or interest in the association. It is therefore plain that the transfer of the stock was on the part of respond-ents, for some reason, a mere subterfuge. Suppose, for illus-tration, Hancock had parted with the stock by transferring it to a third party for a valuable consideration, it is manifest that the transfer would not have carried with it the indebted-ness represented by the $2,500. Paragraph 2 of the contract provides that "should said employment cease through inca-pacity of the second party, or be terminated by his death, in lieu of the guarantee above given the party of the first part guarantees to the second party, his heirs, executors, or admin-istrators, eight per cent. per annum upon the amount paid for said stock." It will be observed that no provision is made for the surrender of the stock in case such a contingency should arise as a condition for the payment of the interest as provided in the contract. It is therefore plain that respond-ents regarded and treated the stock and the obligation or in-debtedness based on the $2,500 as two separate property rights. If the receiving of the $2,500 from Hancock by the respondents did not create an indebtedness on their part, the question naturally arises, why have they been paying Han-

cock interest on the money at the rate of 12 per cent. per annum for four years? If, as respondents now claim, the $2,500 was neither in the nature of a loan nor a pledge to them by Hancock, but was money belonging to themselves as proceeds of the sale of the stock to Hancock, the further question arises, why have they been paying Hancock interest on their own money? The contract makes the obligation a loan on the part of respondents because, as stated, it provides for the payment of interest thereon, and respondents, by paying the interest, have so recognized and treated it.

"Interest is the compensation which is paid by the borrower of money to the lender for its use, and generally by a debtor to his creditor in recompense for his detention of the debt." 4 Words and Phrases, 3706; vol. 2, Second Series, 1145.

In Black's Law Dictionary "interest" is defined as "the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money."

Suppose for illustration, respondents, after Hancock had been in their employ for one month under the contract, had terminated the contract and dispensed with his services which they could have done without breaching it, and, on being sued by Hancock, on the $2,500, they had, as they are endeavoring to do now, tried to defeat the action on the ground that the $2,500 was proceeds of the sale of the worthless stock to Hancock, would it be seriously contended that there is any principle of law or equity that would have prevented a recovery by Hancock? I think not. And especially if, as here, one of the defenses interposed had been that "the contract is against public policy and is unlawful and void." On the other hand, suppose Hancock, after he had been in respondent's employ for one year, had terminated the contract, which he could do without violating any legal duty he owed the respondents, and respondents on being sued for the $2,500 had set up the defenses suggested, or had claimed a forfeiture of the money because Hancock had terminated the contract, under what rule of law or equity, may I ask, could respondents successfully maintain their defense? If Hancock could have terminated the contract at any time within one year

without breaching it, and recovered the $2,500, it necessarily follows that he is entitled to recover in this case.

According to the greater—the overwhelming—weight of evidence the value of the services rendered by Hancock to respondents, during the time he was in their employ, was about $7,000 in excess of the salary he received. Therefore, under the law of the case as declared by the two prevailing opinions rendered on the former appeal, Hancock is legally entitled to judgment for this amount in addition to the $2,500 and interest. In any event, respondents ought not to be allowed the benefits of the value of his services in excess of the salary paid him, and at the same time receive credit in the adjustment of the equities between them for the money they paid Hancock as interest on the $2,500. It being established by evidence beyond any question of a doubt that the value of Hancock's services was greatly in excess of the salary paid him, under what rule of law or of equity can it be held that he should refund to respondents the interest they paid him on the $2,500 in question, and thereby in effect giving them the use of this amount of money for nothing for a period of four years. If the salary paid Hancock exceeded the value of his services, there would be some basis for holding that respondents are entitled to recoup in a sum equal to such excess, and that Hancock have judgment for the balance due him, if any, on the $2,500. Such, however, is not the case. The evidence, as stated, is all but conclusive that the value of Hancock's services to respondents was substantially twice the amount that was paid him as salary.

By ignoring and brushing aside the law of the case for the purpose of this appeal, and disregarding the evidence showing the value of the services rendered by Hancock while he was in respondents' employ, and looking to the contract only for a basis upon which to scale down his demand, he is, under any reasonable or even strained construction of its provisions, entitled to a judgment for $2,000 and interest thereon at the rate of 8 per cent. from January 12, 1913, when he terminated the contract. And this result can only be arrived at by holding that Hancock, under the following provision of the contract

was to continue in respondents' employment for a period of ten years, to wit:

"The parties of the first part agree that at the expiration of ten years, should the party of the second part want to sell out, that the parties of the first part will purchase back from him the stock which he originally bought and pay him one-half of what he paid for it (i. e., $1,250)."

In other words, the amount that respondents' obligation for the $2,500 would be diminished in ten years' time would be equal to $125 per year. Having terminated the contract at the end of the four years, he ought not in equity be required to do more than probate the $1,250 on that basis, and to reduce his claim in the sum of more than $500. An adjustment of the equities of the parties on this basis (and I submit that it is the only basis that the law, or the contract, or the facts furnished for a reduction of his claim) would entitle Hancock to judgment for $2,000, with interest at the rate of 8 per cent. from January 12, 1913.