**Shirley BERUBE, Plaintiff and Appellant,**

v.

**FASHION CENTRE, LTD., dba Fashion Gal of Ogden, Joseph E. Torman, dba Western States Polygraph, Steven Taylor, and John and Jane Does 1–10, Defendants and Appellees.**

**No. 20673.**

Supreme Court of Utah.

March 20, 1989.

Rehearing Denied April 28, 1989.

1034

George W. Preston and Joseph M. Chambers, Logan, for plaintiff and appellant.

Thomas S. Taylor, Provo and Theodore E. Kanell, Salt Lake City, for defendants and appellees.

DURHAM, Justice:

Plaintiff Shirley Berube claims on appeal that the lower court erred in denying her motion to amend her complaint to add a cause of action based on Utah Code Ann. § 34–37–16(2), in granting summary judgment in favor of defendant Western States Polygraph, and in refusing to allow the jury to evaluate plaintiff's case based upon an implied covenant of good faith and fair dealing. We reverse in part, affirm in part, and remand for trial on a theory of breach of an implied term of the employment contract.

## I. FACTS

Plaintiff Shirley Berube was employed by Fashion Centre, Ltd., dba Fashion Gal (Fashion Centre), in its Ogden, Utah store beginning in April 1979. She was initially hired as a sales clerk and was eventually promoted to the position of assistant manager in 1981. Her promotions were based on demonstrated ability and job performance evaluations which ranged from good to superior. Plaintiff was uniformly pleased with her experience at Fashion Centre and anticipated a long career with the company. The accuracy of her expecta-

tions was confirmed by one of her managers, who told her that she could expect to be a store manager someday.

At or near the time she was hired by Fashion Centre, plaintiff became aware of Fashion Centre's written disciplinary action policy. This policy stated that Fashion Centre, in attempting to act equitably, would not terminate employment without prior warning except for specific reasons, including failure to pass or refusal to take a polygraph examination. In all other circumstances, Fashion Centre promised employees a warning and an opportunity to improve performance prior to termination.

Plaintiff admits that she and Fashion Centre did not agree to a specified term of employment. Indeed, she understood that her employment was of no set duration and could be terminated by either party. However, based on a number of representations and procedures, she believed that Fashion Centre would only terminate her for cause.

In the fall of 1981, an apparent inventory shortage[1] of over 3 percent occurred in Fashion Centre's Ogden store. This was an unusually large shortage, and Fashion Centre investigated. The investigation was inconclusive, and Fashion Centre requested that all employees of the Ogden store submit to a polygraph examination. Three employees were allowed to quit rather than undergo the polygraph examination. All others, including plaintiff, agreed to participate.

Fashion Centre provided the polygraph examiner with fifteen questions upon which to base the examination.[2] Defendant Western States Polygraph (Western States) administered this exam to the employees. The examiner found that plaintiff's data suggested deception when she responded negatively to the question, "Do you know for certain who has cheated or stolen anything from that Fashion Gal store?" In a post-test interview, the examiner ascertained that plaintiff had "suspicions of others—especially those who threatened to quit rather than take the polygraph exam." Thus, plaintiff's "stress" reaction was apparently based on her suspicions of others and not on a disloyal withholding of relevant or incriminating information.

Western States forwarded a copy of plaintiff's test results to Fashion Centre headquarters in St. Louis, stating that plaintiff had shown "deception" on only one of fifteen relevant questions and explaining the apparent source of the "deception" result, as revealed in the post-test interview. Even in light of this explanation, Fashion Centre told plaintiff she would be required to take a second examination. Fashion Centre did not tell her why or say that she had failed the first examination.

Although disturbed by the request, plaintiff agreed to submit to the second examination, which was administered by a different polygraph company. She showed no signs of deception and "passed" the exam. A pretest interview, however, revealed that she had, from time to time, rounded off figures of a "class count"[3] when she believed her employees had erred. This information was conveyed to Fashion Centre along with the test results.

Although the first and second polygraph examinations showed no unexplained deception on the part of plaintiff, Fashion Centre demanded that plaintiff undergo a third examination. Plaintiff was not given a reason for the third exam, and she believed, based on comments by the polygraph examiners, that she had "passed" the first two tests. She was distraught at the prospect of enduring another polygraph and by the implicit accusation that accom-

---

**1.** It is unclear whether the shortage ever actually existed or was ultimately recovered.

**2.** Dr. David C. Raskin, an acknowledged expert on the use of polygraphs, stated in an affidavit that the test, as formulated by Fashion Centre and administered by defendant Western States, fell below the polygraph profession's standards of quality.

**3.** A "class count" involves determining the number of a certain item in a store by manual counting. Fashion Centre tabulated inventory by a "perpetual inventory" method, meaning that the arrival and departure of each item (by sale or otherwise) was recorded. Class counting apparently did not relate to the perpetual inventory system and did not affect its accuracy.

panied Fashion Centre's request that she submit to it. She sought advice from co-workers, friends, and relatives as to whether she should submit to the examination.

On the scheduled day of the exam, plaintiff called Fashion Centre's district manager, Jerry Brooks, and told him she was too nervous to take the exam and asked that it be postponed. Mr. Brooks informed her that Fashion Centre could require her to take any number of polygraphs and that she must call Bennett Lerner, Fashion Centre's personnel director, to seek a postponement. Plaintiff immediately called Mr. Lerner and told him she was extremely nervous and upset and could obtain a doctor's statement to that effect. In light of her condition, she asked Mr. Lerner to postpone her examination. Mr. Lerner told her she must take the exam or she would be terminated.

Plaintiff worked her usual shift that day and, at the scheduled time of the exam, called Mr. Brooks to tell him she could not take the exam. He told her to come to work the next day to sign her termination papers. When plaintiff arrived the next morning, she indicated her willingness to submit to the exam in order to retain her position. Mr. Brooks said that was impossible but she might try to reapply within two weeks. She did so, but despite repeated attempts on her part, Fashion Centre failed to respond to her inquiries.

On October 20, 1983, plaintiff filed the complaint in this action, which included causes of action for defamation, wrongful discharge, infliction of emotional distress, and breach of an employment contract. Plaintiff moved to amend her complaint in May 1984. The lower court permitted her to add Western States as a defendant but denied her request to add a cause of action based upon Utah Code Ann. § 34–37–16, entitled "Surreptitious Examinations Prohibited." Western States and Fashion Centre moved for summary judgment. The court granted Fashion Centre's motion for all causes of action except defamation and wrongful discharge. Western States' motion was granted in its entirety.

In a jury trial, Fashion Centre was found not liable to plaintiff. Plaintiff now appeals the trial court's refusal to allow a cause of action based on section 34–37–16(2), the trial court's grant of summary judgment to Western States, and the court's refusal to allow the jury to be instructed on exceptions to the employment-at-will doctrine under her cause of action for wrongful discharge.

## II. PLAINTIFF'S CAUSE OF ACTION BASED ON SECTION 34–37–16

Plaintiff moved to amend her complaint to include a cause of action based on Utah Code Ann. § 34–37–16(2) (1974). The statute provides:

> 34–37–16. Surreptitious examinations prohibited.
>
> It shall be a violation of this act to conduct a deception detection examination by instrument without the physical presence of the subject and through a surreptitious manner where a subject is not aware of the examination. Furthermore, it shall be unlawful for: (1) any deception detection examination to be conducted by instrument by out-of-state examiners through telephonic means to anyone in Utah or for Utah examiners to use telephonic means to determine truth or deception; or (2) refusal to submit to such examination to be the basis for denying or terminating employment.

The trial court denied plaintiff's motion to add a cause of action based on this statute to her complaint because all parties agreed that no surreptitious examination had taken place. The court premised its decision on the assumption that section 34–37–16 applies only to deception detection examinations administered without the subject's knowledge or presence.

Plaintiff argues on appeal that although section 34–37–16 was originally drafted to apply solely to surreptitious examinations, subsection (2) applies to all deception detection examinations as defined in the Deception Detection Examiners Act, Utah Code Ann. §§ 34–37–1 to –16 (1988). Plaintiff relies on statements made by Representative Dale Stratford on the Utah House of

Representatives floor, who proposed the language in subsection (2), and an informal opinion issued by the Office of Legislative Research. Representative Stratford spoke on behalf of the section's adoption in very broad and ambiguous terms, which suggest that he contemplated the statute would serve to prevent termination when an employee refused to take any type of deception detection examination, including a polygraph. The Office of Legislative General Counsel, opinion No. 81–012, July 7, 1981, examined section 34–37–16(2) in context and according to standard rules of statutory construction. It concluded that subsection (2) refers to all deception detection examinations, not just voice stress examinations. This construction is necessary, it claims, to make sense of the statute. Otherwise, it would prohibit terminating an employee for refusing to submit to an illegal examination.

Fashion Centre argues that the statute applies only to surreptitious exams where the subject is both not present and unaware of the examination. In support of this position, defendant cites Utah State Attorney General informal opinion No. 81–80. Fashion Centre reasons that the statute is clear on its face and should be applied accordingly, regardless of any specific intent formed by a particular legislator. For the reasons set forth hereafter, we agree with Fashion Centre and hold that the statute, as adopted, does not apply to polygraph examinations.[4]

The rulings of a trial court regarding statutory construction are not entitled to particular deference. *Betenson v. Call Auto & Equipment Sales, Inc.*, 645 P.2d 684, 685–86 (Utah 1982). In analyzing section 34–37–16, we are guided by the rule that in the absence of an ambiguity, a statute should be construed according to its plain language. *See Johnson v. State Retirement Office*, 755 P.2d 161; *State v. Archuletta*, 526 P.2d 911 (Utah 1974). Although legislative intent is important, *see*

*Osuala v. Aetna Life & Casualty*, 608 P.2d 242, 243 (Utah 1980), the best indication of legislative intent is the statute's plain language. *Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 906 (Utah 1984). Based upon the plain and unambiguous language of the statute, we hold that section 34–37–16(2) applies only to surreptitious deception detection examinations. This does not include polygraphs.

Section 34–37–16 prohibits surreptitious exams where the subject is not present or is unaware of the examination's occurrence. Subsection (1) prohibits telephonic examinations, such as voice stress examinations. Subsection (2) prevents an employer from denying employment to, or terminating the employment of, an individual who refuses to submit to surreptitious examination. Plaintiff argues that this interpretation is nonsensical because it makes it illegal for an employer to terminate an employee for refusing to submit to an illegal examination. Additionally, if the examination is surreptitious, the employee is either not present or unaware of it and therefore cannot refuse to submit. When section 34–37–16 was adopted, Utah law allowed an employer to fire an at-will employee for good cause, bad cause, or no cause at all. *See Bihlmaier v. Carson*, 603 P.2d 790 (Utah 1979). Thus, the statute serves to protect employees or potential employees from termination where the employer informs them of the possibility of on-going or future surreptitious examinations and the applicants or employees refuse consent or cooperation with such practices.

Assuming the breadth of the interpretation argued for by plaintiff, it seems unlikely that the legislature would have adopted it as part of a statute dealing with a mere subset of deception detection examinations. Indeed, plaintiff's interpretation would disallow all attempts to screen potential employees and to examine current employees by way of polygraph examinations. It is likely that such a far-reaching

---

4. Fashion Centre also cursorily argues that this Court has no jurisdiction to review this issue because of plaintiff's failure to file a timely notice of appeal. Fashion Centre cites Utah Rule of Civil Procedure 72(a), which allowed

parties to preserve issues adjudged prior to final judgment only by filing a notice of intent to appeal. Rule 72(a) has been repealed and replaced by rule 3 of the Rules of the Utah Supreme Court.

determination would be explicitly articulated by the statute if that were its purpose.[5] Moreover, it is very unlikely that the legislature would have left such a substantial exception to existing Utah law in such an obscure form for seven years after its initial formulation. A legislative desire to create such a broad exception to the at-will doctrine could be expressed quite simply by enacting the language in subsection (2) as a separate statute.[6] Neither the circumstances of subsection (2)'s adoption nor its language supports plaintiff's interpretation. Therefore, we affirm the trial court's decision.

### III. PLAINTIFF'S NEGLIGENCE CLAIM

Plaintiff amended her complaint to include a claim for negligent misrepresentation by Western States and Fashion Centre. Plaintiff claims that the results of her first polygraph were incorrectly reported by Western States and were based upon a faulty test derived from questions negligently formulated by Fashion Centre.

Fashion Centre and Western States deny liability both because plaintiff signed a release of all claims against Western States and Fashion Centre and because the first polygraph examination was not the "proximate cause" of plaintiff's termination. They argue that plaintiff's failure to take the third examination was the proximate cause of her termination. Defendants moved for summary judgment based on these grounds. The trial court granted the motion, citing the proximate cause argument as the basis for its decision.

In reviewing a summary judgment, we liberally construe all evidence and reasonable inferences therefrom in favor of the party opposing the motion. *Payne ex rel. Payne v. Myers*, 743 P.2d 186 (Utah 1987); *Oberhansly v. Sprouse*, 751 P.2d 1155 (Utah Ct.App.1988). We are free to reappraise the trial court's legal conclusions. *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987). Further, we will affirm the trial court on any proper ground, even if the court below assigned an incorrect reason for its ruling. *Allphin Realty, Inc. v. Sine*, 595 P.2d 860, 861 (Utah 1979).

Before submitting to the first polygraph examination in question, plaintiff agreed to sign a paper entitled "Consent to Polygraph Examination," which stated:

I, Shirley Berube, age 28 of my own free will and without duress, agree to submit to a polygraph test. I hereby waive and release any and all claims and causes of action of every kind whatsoever against Gateway Apparel, Fashion Centre, Ltd. dba Fashion Gal and Western States Polygraph and its examiner.

Having read and understood the above, I signify my agreement by my signature.

Below and on appeal, defendants argue that this consent form releases them of all liability. Although she responded to this argument below, plaintiff does not dispute the scope or validity of the release on appeal.[7] Thus, if defendants' arguments are correct, plaintiff has waived her claims for negligence.

In *Horgan v. Industrial Design Corp.*, 657 P.2d 751 (Utah 1982), we set forth general principles governing the use and application of releases and waivers. De-

5. We express no view approving or disapproving the use of polygraphs in employment situations. Their use in the employment setting, however, has been criticized. *See* Raskin, *The Polygraph in 1986: Scientific, Professional and Legal Issues Surrounding Application and Acceptance of Polygraph Evidence*, 1986 Utah L.Rev. 29 (1986); Comment, *Privacy: The Polygraph in Employment*, 30 Ark.L.Rev. 35 (1976); Note, *Lie Detectors in the Employment Context*, 35 La.L.Rev. 694 (1975). We reserve judgment on this issue.

6. Several states have enacted statutes which have served as the basis for a public policy exception to the at-will rule. *See, e.g., Molush v. Orkin Exterminating Co.*, 547 F.Supp. 54 (E.D. Pa.1982); *Cordle v. General Hugh Mercer Corp.*, 325 S.E.2d 111 (W.Va.1984); *see also* 14 Am.Jur. 2d 16 *Proof of Facts* § 4 (1977).

7. In her opposition to Western States' motions for summary judgment, plaintiff argues that the words "Fashion Centre dba Fashion Gal" had been added to the consent form after plaintiff had signed it. This argument is not raised on appeal and is not considered herein.

fendants' release is a contract and may be enforced or challenged on the same grounds as any contract. *Id.* at 753. One challenge to a release's validity, argued by plaintiff below but not on appeal, is that the release was signed under duress. Emotional distress, however, is not equivalent to duress, and economic necessity alone is insufficient to invalidate a signed release. *Id.*

Plaintiff apparently signed the release voluntarily. She offers no argument of duress on appeal. The release, by its terms, relieves both Western States and Fashion Centre from liability related to the first polygraph examination. This contract is enforceable and, as a matter of law, precludes plaintiff's claims of negligence.

We do not hold that plaintiff could not have raised legitimate claims challenging the release. *See, e.g., Bekins Bar V Ranch v. Huth,* 664 P.2d 455 (Utah 1983) (unconscionable contractual provisions are unenforceable). In this case, however, plaintiff does not challenge defendants' reliance upon the express terms of the release. Therefore, we affirm the trial court's ruling on defendants' motions regarding plaintiff's negligence claims.[8]

## IV. PROPRIETY OF REVIEW OF PLAINTIFF'S OBJECTIONS TO THE TRIAL COURT'S JURY INSTRUCTIONS

Plaintiff claims the trial court erred in disallowing jury instructions based upon various exceptions to the at-will employment rule. Plaintiff initially sought to present evidence to the jury on exceptions to the at-will doctrine. The trial court refused to permit her to do so. Plaintiff then drafted jury instructions which were in accord with the trial court's ruling. Plaintiff did not thereafter object to specific instructions, but did renew her arguments that the instructions in their entirety did not

---

8. Because we affirm the trial court based on the release, we do not address the proximate cause issue.

9. For a more detailed historical exposition, *see Pugh v. See's Candies, Inc.,* 116 Cal.App.3d 311, 171 Cal.Rptr. 917 (1981); Note, *Protecting At-*

reflect either the correct or the desired state of Utah law governing at-will employment.

Due to the dynamic state of this area of the law and the questionable foundations upon which the at-will doctrine rests, we will examine plaintiff's arguments in the interests of justice. Utah R.Civ.P. 51. This is an unusual case where the plaintiff seeks to alter the boundaries of the law. The trial court was aware of plaintiff's attempt and based its ruling on existing law. However, because of plaintiff's uncommon request, we consider it appropriate, under rule 51, to examine the legal issues presented.

## V. THE AT–WILL EMPLOYMENT RULE

### A. *Historical Background*

Nineteenth century English courts employed the general presumption that an employment relationship created without any specific duration amounted to a general hiring of one-year duration. Note, *Implied Contract Rights to Job Security,* 26 Stan.L.Rev. 335, 340 (1974).[9] With the advent of the industrial revolution, courts in the United States began to rely increasingly on notions of freedom of contract in construing employment relationships. *Pugh v. See's Candies, Inc.,* 116 Cal.App. 3d 311, 320-21, 171 Cal.Rptr. 917, 921 (1981). The genesis of the at-will rule in its present form in America, however, can be traced to Horace G. Wood's 1877 treatise on the master-servant relationship. H. Wood, *Master and Servant* § 134 (1877), *cited in* Note, *Implied Contract Rights to Job Security,* 26 Stan.L.Rev. 335, 341 (1974). Wood proffered his rule without analysis and cited apparently inapposite authority on its behalf. *Id.* at 341–43. Notwithstanding its dubious antecedents, the rule was adopted by many jurisdictions without careful or thorough examination.

*Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith,* 93 Harv.L.Rev. 1816 (1980); Note, *Implied Contract Rights to Job Security,* 26 Stan.L.Rev. 335 (1974), and authorities cited therein.

In the leading case of *Martin v. New York Life Insurance Co.*, 148 N.Y. 117, 42 N.E. 416 (1895), the court repudiated the common law presumption that a general hiring was for a term of one year and uncritically embraced the at-will rule as framed by Wood. The *Martin* opinion did not analyze any prior authority, but did assert that several other states had adopted the at-will rule. The *Martin* decision was not atypical. Most courts offered no rationale or analysis for substituting the at-will doctrine for the common law presumption. By the arrival of the twentieth century, the at-will doctrine was well-established throughout the United States and served to reinforce turn-of-the-century ideas concerning *laissez-faire* economics and freedom to contract. Note, *Implied Contract Rights to Job Security*, 26 Stan.L.Rev. at 340; Note, *Protecting At–Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv.L.Rev. 1816, 1824–26 (1980).

The development and establishment of the at-will rule in Utah was also accomplished without critical examination. The first Utah case referring to the at-will rule was *Price v. Western Loan & Savings Co.*, 35 Utah 378, 100 P. 677 (1909). The *Price* Court held that a written employment contract, terminable only when the employee's services were either unsatisfactory or unnecessary, was terminable at will. The Court stated that the contract lacked mutuality because the employee could terminate at any time whereas the employer was bound to retain the employee until his services were unsatisfactory. Thus, the contract was terminable at the will of either party. *Id.* at 387, 100 P. 677; *see also Hancock v. Luke*, 52 Utah 142, 173 P. 137 (1918).

In 1957, this Court decided *Held v. American Linen Supply Co.*, 6 Utah 2d 106, 307 P.2d 210 (1957). After examining a collective bargaining agreement that contained no express term of duration, the Court reversed the trial court and found that the employment relationship existed at the will of either party. The Court stated, "Whether respondent has a cause of action if she were discharged without just cause depends upon the terms of the contract, either express or implied...." *Id.* at 109, 307 P.2d at 211. This same general rule was utilized in a number of Utah cases. *See Bullock v. Deseret Dodge Truck Center, Inc.*, 11 Utah 2d 1, 5, 354 P.2d 559, 562 (1960); *Crane Co. v. Dahle*, 576 P.2d 870, 872–73 (Utah 1978) (citing no authority for the rule); *Bihlmaier v. Carson*, 603 P.2d 790, 792 (Utah 1979).

This Court's latest consideration of the rule was in *Rose v. Allied Development Co.*, 719 P.2d 83 (Utah 1986). Therein, we recognized that the traditional at-will rule had been modified by both federal and state legislation. *Id.* at 85. We also emphasized two judicially created exceptions to the rule in that case. Where there is an "implied or express stipulation as to the duration" of the employment contract or where there is "good consideration in addition to the services contracted to be rendered," the contract may be removed from the "at-will category" and become terminable for cause alone. *Id.* at 85–86.

Thus, this Court historically adopted the at-will rule wholesale and applied it without considering possible countervailing interests. We have recently enunciated limited exceptions to the doctrine in recognition of its unfairness in some circumstances. We now consider the general status of the at-will rule and whether it is appropriate for this Court to expand or adopt further exceptions to the rule.

### B. *Exceptions to the At–Will Rule*

In the last several decades, judicial decisions have resulted in the development of three primary categories of exceptions to the at-will rule. First, where an employee is fired in a manner or for a reason that contravenes a recognized and established public policy, the at-will rule will not serve to insulate the employer from liability. Second, courts have clarified the requirements for finding an express or implied contract term for employment for a certain period or a covenant for dismissal only with cause. Finally, many courts have relied upon the implied covenant of good faith and fair dealing and have granted the dis-

charged employee a cause of action to sue when the employer's conduct breaches that implied covenant. This cause of action may sound in tort, contract, or both, depending upon the jurisdiction. We will examine these categories in turn.

### 1. Public Policy

■ Perhaps the most logical exception to the at-will rule is based upon public policy. Where an employee is discharged for a reason or in a manner that contravenes sound principles of established and substantial public policy, the employee may typically bring a tort cause of action against his employer. In *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959), the court held that an employee may maintain a cause of action for wrongful discharge where the discharge was in violation of substantial public policy. The plaintiff in *Petermann* alleged that he had been discharged for his refusal to make false statements before a California legislative committee. The court reversed the lower court's decision to enter a judgment on the pleadings, reasoning that because perjury and the solicitation to commit perjury are crimes, discharging an employee for his refusal to commit perjury would contravene legislatively announced, substantial principles of public policy.

The California Supreme Court found the *Petermann* decision persuasive. *See Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980). In *Tameny*, officials of the Atlantic Richfield Co. allegedly requested that the plaintiff participate in an illegal price-fixing scheme. The plaintiff refused and was terminated shortly thereafter. The lower court sustained the defendant's demurrer, and the plaintiff appealed. The California Supreme Court reinstated the plaintiff's complaint, noting:

> It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge an employee, whether the employment be for a designated or [an] unspecified duration, on the ground that

the employee declined to commit perjury, an act specifically enjoined by statute. *Id.* 164 Cal.Rptr. at 840, 610 P.2d at 1333 (quoting *Petermann*, 174 Cal.App.2d at 188–89, 344 P.2d at 27).

Although both *Petermann* and *Tameny* involve factual situations that clearly support a public policy exception, some courts have recognized that the nature and scope of "substantial public policies" upon which the exception is based are not always so easily discerned. In fact, a precise definition of public policy may be virtually impossible. As the court in *Petermann* stated:

> The term "public policy" is inherently not subject to precise definition. In *Maryland Casualty Co. v. Fidelity & Casualty Co.*, 71 Cal.App. 492 at page 497, 236 P. 210 [at] 212, the court stated: "The question, what is public policy in a given case, is as broad as the question of what is fraud." Also in *Noble v. City of Palo Alto*, 89 Cal.App. 47 at pages 50–51, 264 P. 529 at page 530, the court said: "Public policy is a vague expression, and few cases can arise in which its application may not be disputed." Mr. Story in his work on Contracts (§ 546), says: "It has never been defined by the courts, but has been left loose and free of definition in the same manner as fraud." By "public policy" is intended that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.

*Petermann*, 174 Cal.App.2d at 188, 344 P.2d at 27 (citing *Safeway Stores v. Retail Clerks Int'l Ass'n*, 41 Cal.2d 567, 575, 261 P.2d 721, 726 (1953)). In Utah, we have frequently invoked the concept of public policy without articulating precisely its origin or definition. *See, e.g., Ellis v. Gilbert*, 19 Utah 2d 189, 429 P.2d 39 (1967); *Allstate Ins. Co. v. United States Fidelity & Guar. Co.*, 619 P.2d 329 (Utah 1980); *Farmers Ins. Exchange v. Call*, 712 P.2d 231 (Utah 1985).

Legitimate reliance on a public policy exception to the at-will rule requires an attempt to identify the proper sources of public policy and the principles which un-

derlie it. In addressing this very question, the court in *Townsend v. L.W.M. Management, Inc.*, 64 Md.App. 55, 494 A.2d 239, 243 (1985), stated:

Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law.

(Quoting *Adler v. American Standard Corp.*, 291 Md. 31, 45, 432 A.2d 464, 472 (1981) (citation omitted).) Public policy is most obviously, but not exclusively, embodied in legislative enactments. The legislature, acting in consonance with constitutional principles and expressing the will of the people, determines that which is in the public interest and serves the public good. Not every legislative enactment, of course, embodies public policy; only those which protect the public or promote public interest qualify.

The legislature is not the only source of public policy, however. *See Dabbs v. Cardiopulmonary Management Servs.*, 188 Cal.App.3d 1437, 1441, 234 Cal.Rptr. 129, 132 (1987). Limiting the scope of public policy to legislative enactments would necessarily eliminate aspects of the public interest which deserve protection but have limited access to the political process. Judicial decisions can also enunciate substantial principles of public policy in areas which the legislature has not treated. Therefore, although it is not by any means a foregone conclusion that the public interest or will be implicated in cases of employee termination, public policy on this question generally may be derived from both legislative and judicial pronouncements.

In recognizing and following principles of public policy, we must be careful to avoid overextension of the principles involved. As the United States Supreme Court has stated:

The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection. The public policy of one generation may not, under changed conditions, be the public policy of another.

*Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930). This principle applies equally in employment litigation. Although a given employee may feel that his or her termination violates a fundamental tenet of public policy, a court must carefully evaluate whether the public policy identified is fundamental and permanent or superficial and transitory. In fact, even those principles which are widely held values may not be sufficient to justify wrongful termination recovery. For example, although it is this state's expressed policy to provide and promote job security and full employment for its citizens, this public policy would be insufficient grounds upon which to maintain a wrongful termination action. *See, e.g., Shapiro v. Wells Fargo Realty Advisors*, 152 Cal.App.3d 467, 477, 199 Cal.Rptr. 613, 618 (1984); *Newfield v. Insurance Co. of the West*, 156 Cal.App.3d 440, 444, 203 Cal.Rptr. 9, 11 (1984).

We acknowledge that a public policy exception has no application in this case. Nonetheless, we recognize that a public policy exception is necessarily a threshold issue implicated in our reexamination of the scope of Utah's at-will rule, and we have therefore been willing to consider and define it. We also stress that actions for wrongful termination based on this exception must involve *substantial* and *important* public policies. To this end, we will construe public policies narrowly and will generally utilize those based on prior legislative pronouncements or judicial decisions, applying only those principles which are so substantial and fundamental that there can be virtually no question as to their importance for promotion of the public good.[10]

---

10. We note that a cause of action for dismissal in violation of public policy must lie for both at-will employees and employees for a specified term. It would make little sense for at-will

### 2. Implied or Express Contract

█ An employee may demonstrate that his at-will termination breached an express or implied agreement with the employer to terminate him for cause alone. The at-will rule, after all, is merely a rule of contract construction and not a legal principle. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 628 (Minn.1983). The rule creates a presumption that any employment contract which has no specified term of duration is an at-will relationship. This presumption can be overcome by an affirmative showing by the plaintiff that the parties expressly or impliedly intended a specified term or agreed to terminate the relationship for cause alone. Such evidence may be found in employment manuals, oral agreements, and all circumstances of the relationship which demonstrate the intent to terminate only for cause or to continue employment for a specified period. Although in the past the presumption in favor of at-will employment has been difficult to overcome, rigid adherence to the at-will rule is no longer justified or advisable.

In *Rose v. Allied Development Co.*, 719 P.2d 83 (Utah 1986), we stated, "In the absence of some further express or implied stipulation as to the duration of employment or of a good consideration in addition to the services contracted to be rendered, the contract is no more than an indefinite general hiring which is terminable at the will of either party." *Rose*, 719 P.2d at 85 (citing *Bihlmaier*, 603 P.2d at 792). Thus, this Court has recognized that an express or implied agreement between employer and employee as to the duration of the employment, including an agreement to dismiss only for cause, rebuts the presumption of the at-will rule and would permit an employee to seek recovery for breach of contract. We also stated in *Rose* and *Bihlmaier* that an employee may demonstrate consideration in addition to the services to be rendered in order to bring a cause of action based on breach of contract. *Id.* at 85 (quoting *Bihlmaier*, 603 P.2d at 792 (footnote omitted)).

Thus an employee may remove his contract from the at-will category under *Rose* and *Bihlmaier* by showing an express agreement to a term of employment or to dismissal for cause alone. If such an agreement has been made, it is subject to proof. As we have stated; "[A] cardinal rule in construing ... a contract is to give effect to the intentions of the parties...." *Buehner Block Co. v. U.W.C. Assocs.*, 752 P.2d 892, 895 (1988); *see also Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 452, 168 Cal.Rptr. 722, 727 (1980). Thus, parties to an employment contract may prove in court any express terms of that contract so as to accomplish the agreement's intended purpose.

A second possible approach under *Bihlmaier* and *Rose* is for an employee to prove the existence of an implied-in-fact term of the contract specifying duration of employment or limiting the reasons for dismissal. As previously noted, employment contracts should be construed to give effect to the intent of the parties. An implied-in-fact promise is a judicial attempt to reach precisely that result. The conclusion that a promise exists may arise from a variety of sources, including the conduct of the parties, announced personnel policies, practices of that particular trade or industry, or other circumstances which show the existence of such a promise. *See, e.g., Pugh v. See's Candies, Inc.*, 116 Cal.App. 3d 311, 171 Cal.Rptr. 917 (1981); *Shapiro v. Wells Fargo Realty Advisors*, 152 Cal. App.3d 467, 199 Cal.Rptr. 613 (1984). An implied-in-fact promise cannot, of course, contradict a written contract term. *See, e.g., Shapiro*, 152 Cal.App.3d at 482, 199 Cal.Rptr. at 622. Nevertheless, the determination of whether sufficient indicia of an implied-in-fact promise exists is a question of fact for the jury, with the burden of proof residing upon the plaintiff-employee.

One of the leading cases dealing with implied terms in an employment contract is *Pugh v. See's Candies, Inc.* In *Pugh*, an

employees to enjoy the protection of substantial public policies while employees for term were

denied them.

employee of over thirty-two years was terminated for no readily apparent or articulated reason. The court in *Pugh* reviewed the legal history of the at-will rule, disavowed the need for exchange of independent consideration, and reversed the trial court's grant of nonsuit. In so doing, the court noted that a variety of factors could be considered to determine whether an implied-in-fact promise for continued employment or dismissal for cause alone existed. The factors included the "personnel policies or practices of employer, the employee's longevity of service, actions or communications by the employer reflecting assurances or continued employment, and the practices of the industry in which the employee is engaged." *Id.* at 327, 171 Cal.Rptr. at 925–26; *see, e.g., Alexander v. Phillips Oil Co.,* 707 P.2d 1385 (Wyo.1985).

◼ Some courts have refused to accept an implied-in-fact alteration of the at-will rule because it would eliminate mutuality of obligation under the contract. These concerns, however, are unfounded. The ostensible need for mutuality arises from the nature of the at-will rule itself, in that a fundamental assumption is that because an employee may terminate the employment relationship at any time, the employer should likewise be free to do so. In a modern economy, however, this "freedom" of the employee is largely illusory. *Cleary,* 111 Cal.App.3d at 449, 168 Cal. Rptr. at 725. Moreover, an inquiry into the mutuality of obligation is "simply a species of the forbidden inquiry into the adequacy of consideration...." *Pine River State Bank v. Mettille,* 333 N.W.2d at 629. Indeed, the fact that one party, the employee, can terminate a contract at his or her will does not serve to invalidate the contract where the second party, the employer, is bound to continue the contract for a specified time or period. *Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 463–66, 457 N.Y. S.2d 193, 196–97, 443 N.E.2d 441, 444–45 (1982); 1A *Corbin on Contracts* § 152, at 13–17 (1963). Therefore, mutuality of obligation should not be a barrier to the enforcement of an implied-in-fact promise made by the employer to provide employ-

ment for a specified term or to terminate the employee for cause alone.

◼ Similarly, independent consideration should not be required for implied-in-fact promises by the employer which are made after the employee has commenced work. In *Yartzoff v. Democrat–Harold Publishing Co.,* 281 Or. 651, 657, 576 P.2d 356, 359 (1978), for example, the court held that even though the employer's implied-in-fact promise was contained in a handbook delivered to the employee several days after the employee began work, sufficient consideration was given by the employee to enforce the promise. The employee's "continued employment after receiving the handbook provided sufficient consideration for any such modification of the original contract of employment." *Id.; see also Carter v. Kaskaskia Community Action Agency,* 24 Ill.App.3d 1056, 1059, 322 N.E.2d 574, 576 (1974); *Pine River State Bank,* 333 N.W. 2d at 629; *Mobil Coal Producing, Inc. v. Parks,* 704 P.2d 702, 707 (Wyo.1985). Additionally, the "independent consideration" rule espoused in *Bihlmaier* and *Rose* constitutes only an evidentiary consideration and does not amount to a separate standard for determining whether an employee's employment relationship is at will. *See Pugh,* 116 Cal.App.3d at 325–26, 171 Cal.Rptr. at 924–25; *Pine River State Bank,* 333 N.W.2d at 628–29. If the employee has given consideration apart from the services he has agreed to render for a contract of set duration, then that contract provision will be enforceable. The lack of separate consideration, however, is not fatal to a cause of action based upon an express or implied-in-fact promise by the employer that moves the employee's contract from at-will status. Instead, separate consideration merely signals the parties' intent more clearly. Any combination of the factors mentioned above might be sufficient to find an implied-in-fact promise. Separate consideration is but one of those factors.

The ability of employees to bring causes of action based upon express or implied-in-fact promises by the employer will not eliminate the at-will construction of most

employment contracts. Courts have expressed concern that due deference be paid to managerial discretion and normal employment decisions. *See, e.g., Pugh,* 116 Cal.App.3d at 330, 171 Cal.Rptr. at 928. Nonetheless, where an enforceable promise has been made, employees should be able to find redress when it is breached.

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing

■ Utah has recognized that all contracts contain a covenant of good faith and fair dealing. *Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 798 (Utah 1985).[11] This includes, in this writer's view, employment contracts. Other jurisdictions have approached this exception to the at-will rule in a variety of ways. Annotation, *Modern Status of Rule that Employer May Discharge At–Will Employee for any Reason,* 12 A.L.R.4th 544 (1982 & Supp.1987). Indeed, there appears to be no clear majority rule; many jurisdictions have recently considered this issue and set forth their own approach.

Montana, for example, implies a covenant of good faith and fair dealing in an employment contract only where the conduct or words of the parties indicate that they contemplated such a covenant. *See, e.g., Dare v. Montana Petroleum Mktg. Co.,* 212 Mont. 274, 687 P.2d 1015, 1020 (1984). California used to permit a course of action sounding in tort for the employer's breach of the implied covenant of good faith and fair dealing. *See, e.g., Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal. Rptr. 722 (1980) (disapproved by *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 765 P.2d 373, 254 Cal.Rptr. 211 (1988), only as to tort remedies)). With *Foley,* California appears to have adopted the position this Court took in *Beck* that the ability of a plaintiff to recover in tort for breach of the implied covenant of good faith and fair dealing in a contract "has the potential for distorting well-established principles of contract law and will not be permitted." *Beck,* 701 P.2d at 799. We held in *Beck* that the damages permissible for a cause of action *in contract* for breach of the implied covenant of good faith include all types of reasonably foreseeable consequences naturally flowing from the breach.

I do not mean to suggest that any termination without cause of an at-will employee is tantamount to a breach of an implied covenant. The scope of the implied covenant is determined by the factual setting in which it is found. Indeed, where the reasonable expectations of the parties are met, there is no breach. Moreover, the motive of the employer in terminating the employee, although possibly relevant, is not necessarily a key issue. More important is the employer's conduct viewed in the context of the relevant contractual terms, express or implied, and the employee's reasonable expectations. *See, e.g., Rulon–Miller v. Int'l Business Machs. Corp.,* 162 Cal. App.3d 241, 253, 208 Cal.Rptr. 524, 533 (1984).[12] Many of the cases finding lack of good faith on the part of an employer have involved situations where the employee was denied salary, commissions, or benefits. *See, e.g., Fortune v. Nat'l Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977); *see also* cases collected at Note, *Protecting Employees At–Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv.L.Rev. 1931, 1936 nn. 42–43 (1983). Not all cases, however, have been so limited. In *Khanna v. Microdata Corp.,* 170 Cal.App.3d 250, 215 Cal.Rptr. 860 (1985), the court noted that any given factor is not dispositive of an action for wrongful discharge. Instead, the question of an employer's breach of the good faith covenant is one for the fact finder and can only be determined in light of all relevant circumstances, including the contract's terms, the employer's conduct, and the em-

---

**11.** For commercial contracts, this covenant is statutorily imposed. Utah Code Ann. § 70A–1–203 (1980).

**12.** As we noted in *Beck,* "[B]ecause the considerations are similar, we freely look to the tort cases that have described the incidents of the duty of good faith" even though we do not support a tort-based action. *Beck,* 701 P.2d at 801.

ployee's reasonable expectations.[13] *See Khanna,* 170 Cal.App.3d at 262, 215 Cal. Rptr. at 867. In any case, the duty of good faith is "unconditional and independent in nature" and requires the parties to deal fairly with each other and to avoid any act which will "injure the right of the other to receive the benefits of the agreement." *Cleary,* 111 Cal.App.3d at 453, 168 Cal. Rptr. at 728 (citation omitted); *see also Beck,* 701 P.2d at 801; *Ammerman v. Farmers Ins. Exch.,* 19 Utah 2d 261, 430 P.2d 576 (1967).

Admittedly, the concept of good faith and fair dealing is not susceptible to bright-line definitions and tests. It should therefore be used sparingly and with caution. Where true injustice has occurred, relief should be provided. Care must be exercised to avoid eclipsing the rule by expanding the exception.

### C. Analysis of Plaintiff's Wrongful Termination Claims

As discussed above, there are three possible situations where the at-will rule may not apply to an employment contract for an unspecified term. One is where the employee's termination violates an important public policy. This exception is not implicated in the case before us. A second is where an express or implied contractual term sets forth a period of duration or limits dismissal to cause alone. Finally, this opinion discusses an implied covenant of good faith and fair dealing in all employment contacts which would serve as an exception to the at-will rule. In my view, plaintiff has stated a claim for relief under the second and third exceptions and is entitled to a jury determination of whether Fashion Centre breached the implied-at-law covenant of good faith and fair dealing as well as implied terms of its employment contract.

The scope of the covenant of good faith and fair dealing is determined by the factual setting in which it is formed. This includes any implied-in-fact contractual terms which are proven to exist between the parties. The evidence in this case of the parties' actions and agreements establishes a prima facie showing of an implied covenant of good faith and a subsequent breach by Fashion Centre.

Fashion Centre created and distributed a disciplinary action policy which was read and understood by plaintiff. The stated purpose of the policy was to "equitably and constructively handle situations involving disciplinary action which may result in dismissal of an employee." Under this policy, an employee could be terminated without prior warning only for a few specific reasons. Among these were the refusal to take a polygraph test and the failure to pass a polygraph test.[14] In all other situations, however, Fashion Centre told its employees that termination would occur only where the employee was properly warned and given a reasonable opportunity to improve performance. The written policy manual then goes on to outline extensive procedures involved in warning the employee and allowing him or her to improve. It would appear that Fashion Centre thereby

---

**13.** A list of relevant factors might possibly include:

> (1) whether or not the employee was discharged for legitimate business, managerial and employment reasons; (2) whether or not the employee was engaged in a sensitive or confidential management position; (3) whether or not the employee had a conflict of interest; (4) whether or not the employee's personal, private or social relationships endangered, injured or jeopardized the employer's legitimate business interests; (5) whether or not the employer violated, invaded or infringed upon the employee's personal privacy and personal, private and social relationships; (6) whether or not the employee was discrimi-

nated against by the employer because of that employee's sex.

*See Rulon–Miller v. Int'l Business Machs. Corp.,* 162 Cal.App.3d at 252 n. 6, 208 Cal.Rptr. at 532 n. 6.

**14.** The entire list reads:
> 1) Insubordination
> 2) Dishonesty
> 3) Disclosing confidential company information
> 4) Falsification of company records
> 5) Destruction of company property
> 6) Gross negligence
> 7) Refusal to take a polygraph
> 8) Failure to pass a polygraph
> 9) Gross misconduct.

adopted a policy of dismissal for cause, the only exceptions being limited and specific.

The use of polygraph examinations was deemed necessary by Fashion Centre in order to allow it to investigate inventory shortages. This purpose was made evident to plaintiff upon her date of hire when an employee's duties and the employer's benefits and policies were explained to her.[15] Additionally, Bennett Lerner, the personnel director, testified at plaintiff's trial that the polygraph generally was but one tool used by Fashion Centre to investigate inventory shortages. Thus, by the express terms of Fashion Centre's disciplinary policy, which was explained to plaintiff and understood by her, plaintiff could be dismissed only for cause with the exception of certain specified circumstances. Finally, and in any event, Fashion Centre agreed always to deal equitably with employee termination.

In addition to the express terms of Fashion Centre's disciplinary policy, defendant's actions were consistent with an implied-in-fact term of the employment contract limiting dismissal to situations providing just cause. Throughout her employment with Fashion Centre, plaintiff was given a number of performance reviews. She scored exceptionally well on these reviews, and the comments provided by her superiors were consistently favorable. She was told by several of her superiors that she would advance in the company and had a promising future with Fashion Centre. This was not idle praise. Plaintiff's advancement was rapid, as was her climb in salary. Implied in these performance evaluations was the notion that with a favorable review, an employee was performing to expectations and would be retained. In general, such reviews serve the employer by providing an objective evaluation while encouraging the employee to maintain high levels of performance. There was little reason in this case to share these evaluations with the employee except to imply that the employee would likely be retained or would not likely be retained and to provide the corresponding feelings of security and commitment that a positive review creates.

Moreover, plaintiff's expectations were that she would not be terminated unreasonably. As stated previously, Fashion Centre employed the polygraph as a tool for investigating inventory shortages. Plaintiff had previously taken two polygraph exams and, with no concrete information about the results, assumed she had passed both. On the day scheduled for the third exam, she arrived at work, stated she did not want to take the exam, and requested additional time to prepare herself if she was going to be compelled to take it. Plaintiff did not expect, nor was it reasonable for her to expect, to be fired after submitting to and successfully passing two polygraph examinations. Such behavior by Fashion Centre was inconsistent with its stated policies and with plaintiff's objectively reasonable expectations. Thus, the conduct of both plaintiff and defendant supports the conclusion that Fashion Centre's disciplinary action policy limited employees' dismissal to for-cause situations, with the only relevant exception being refusal to take a polygraph examination.

Plaintiff argues that her dismissal was improper because the disciplinary action policy permits termination for "refusal to take a polygraph," meaning a single polygraph, and not for refusal to submit to three separate polygraphs. This analysis is oversimplified. Admittedly, it was unreasonable in this case to request plaintiff to submit to three separate polygraph exams over one inventory shortage. However, if plaintiff's construction were given to the policy language in question, Fashion Centre would be limited to requesting that any employee take a single polygraph exam for the entire duration of that person's employment. Hence, if an employee were employed over a twenty-year period, during which several inventory shortages might occur, Fashion Centre would be allowed to give only a single polygraph ex-

---

15. The explanation was attested to by a document containing check-off boxes for the various policies of the company which plaintiff and her manager signed at the time of her hire. This document included the entry "shortages (polygraph)" with the appropriate box checked off.

amination. This construction is obviously untenable and unacceptable.

I conclude on the evidence that Fashion Centre's actions in this case were, prima facie, unreasonable. Fashion Centre requested that plaintiff take three polygraph examinations over the course of several months dealing with a single inventory shortage, notwithstanding the absence of any indication that she was implicated in the shortage. What plaintiff actually seeks, I conclude, is compensation for breach of the covenant of good faith and fair dealing in connection with the polygraph procedure.

As discussed in the preceding sections, an employer who seeks to deny an employee rights under the employment contract or, in the face of conflicting contractual agreements, acts arbitrarily in terminating an employee, breaches the implied covenant of good faith and fair dealing. It appears that such a covenant may have been breached in the instant case. Fashion Centre requested that plaintiff take two polygraph examinations and did not tell her the result of either one. Based on this silence and the examiner's representations, plaintiff assumed that she had passed both. Plaintiff had submitted to the two separate polygraph examinations in order to aid Fashion Centre in its investigation of a single inventory shortage.

Plaintiff's contract with Fashion Centre included the disciplinary action policy which specified that employees may be terminated for cause alone. Even the portion allowing Fashion Centre to dismiss employees for refusal to submit to "a" polygraph examination implies a condition that the termination without warning will be for cause alone. In other words, failure to submit to a polygraph examination in conjunction with an inventory shortage would be sufficient grounds for dismissal. An employee so acting would deny Fashion Centre the ability to investigate and pursue a solution to a potentially serious problem. Plaintiff, however, had previously submitted to two separate polygraph examinations and had fully cooperated with Fashion Centre's attempts to investigate the inventory short-

age. Thus, the purpose and intent of the policy dismissal provision, as explained by defendant and implied by the conduct of both parties, were fulfilled at least by the completion of the second examination, if not by the first.

Polygraph examinations are apparently a traumatic and emotional experience for plaintiff. Thus, she had serious misgivings and doubts when asked to submit to a third exam. Initially she refused but, upon the appointed date, requested additional time to reschedule the examination. Fashion Centre ignored this request and immediately terminated her. The implied term of dismissal for cause alone in the contract and the capricious and wholly arbitrary termination taken by Fashion Centre, in the face of previous cooperation by plaintiff, suggest a breach of the implied covenant of good faith and fair dealing.

Thus, in my view, the evidence at trial established as a prima facie matter that Fashion Centre breached the implied covenant of good faith and fair dealing. Fashion Centre terminated an experienced, motivated, and favorably reviewed employee who refused to submit to the third polygraph examination required of her in conjunction with a single inventory shortage, even though she had been exonerated by the previous two exams and had requested that the third exam be rescheduled for another day. This action occurred in light of Fashion Centre's own employment policy which essentially limited an employee's termination to just cause.

### D. *Disposition*

This matter is reversed and remanded. On remand, I would permit trial on both the theory of an implied-in-fact contract and the covenant of good faith and fair dealing. Only Justice Stewart has joined this opinion as to the latter, however, and Justice Zimmerman has limited his concurrence to the implied-in-fact exception theory. Therefore, this case will be tried on that basis. At trial, of course, Fashion Centre is free to attempt to demonstrate that there was no implied term in the employment contract or that it was expressly

disavowed, or that for some reason the third polygraph was essential and reasonable and therefore not in breach of the contract.

If, upon retrial, plaintiff is successful, the trial court may award damages. Both general and consequential damages are available for contract breaches, and consequential damages are "those reasonably within the contemplation of, or reasonably forseeable by, the parties at the time the contract was made." *Beck v. Farmers Ins. Exch.*, 701 P.2d at 801. Of course, "[t]he foreseeability of any such damages will always hinge upon the nature and language of the contract and the reasonable expectations of the parties." *Id.* (citing J. Calamari & J. Perillo, *Contracts* § 14–5, at 523–25 (2d ed.1977)).

STEWART, J., concurs.

HOWE, Associate Chief Justice (concurring):

I concur in Parts I, II, and III. I concur only in the results in Parts IV and V, deeming it not necessary or appropriate here to go beyond the written policy manual of the employer, which I view as being part of the total employment contract. *Rose v. Allied Dev. Co.*, 719 P.2d 83 (Utah 1986). The manual stated:

> Except in the situations listed below, an employee may not be dismissed unless a verbal and a written warning have been issued and a reasonable opportunity to improve performance has been provided.

The plaintiff was terminated without warning. I would remand the case to the trial court for a determination of whether the employer's discharge of her violated its own policy manual or whether she was properly discharged for unreasonably refusing to take a polygraph test or for failing a polygraph test, which grounds do not require a previous warning.

HALL, C.J., concurs in the concurring opinion of HOWE, Associate Chief Justice.

ZIMMERMAN, Justice (concurring in the result):

I join in reversing and remanding this matter for trial. I also join in parts I, II, III, IV, and V.A. of the lead opinion. However, I do not join in the remainder of that opinion. I find misleading the portion that purports to survey the current state of the judicially created exceptions to the employment-at-will doctrine, and I cannot agree with the attempt to state in some detail what discharge-based causes of action will be recognized in Utah in the future. Nor do I join in the holding that plaintiff Berube has a cause of action for breach of a covenant of good faith and fair dealing. I would permit this case to go to the jury only on the question of whether defendant Fashion Centre breached a term of the agreement between it and Berube.

As Justice Durham has shown, the employment-at-will doctrine's origins and theoretical underpinnings give it little claim to our allegiance, and courts of various states have made inroads on the doctrine. However, a fact not fully acknowledged in the lead opinion is that there is considerable divergence among the courts that have addressed the issues, both as to the precise content of the several exceptions that have developed and as to the degree of acceptance each of these exceptions has found.[1] Because the law in this area is in a state of flux, and because the at-will doctrine has become well entrenched in our law and any change in it has the potential to affect the practices of almost every employer in Utah, we must proceed with care in recognizing exceptions to that doctrine. *Cf. Johnson v. Rogers*, 763 P.2d 771, 784 (Utah 1988) (Zimmerman, J., concurring) (adopting a conservative and detailed approach to the issue

1. For example, a recent study by the Rand Corporation concludes that while thirty-seven states have recognized a "public policy" exception to the employment-at-will doctrine, only thirty-one have adopted what can be termed an "implied-in-fact" approach, and a mere five have permitted a cause of action under the "covenant of good faith and fair dealing" rubric. Dertouzos, Holland, & Ebener, *The Legal and Economic Consequences of Wrongful Termination*, 3602 RAND Inst. for Civ. Just. 1, 13 (1988). This study also recognizes that there is a good deal of divergence among the courts as to what each of these exceptions means. *Id.* at 1, 4–12, 13 n. 2.

of punitive damages for drunk driving); *Yorgason v. County Bd. of Equalization ex rel. Episcopal Management Corp.*, 714 P.2d 653, 661 n. 1, 664 n. 5 (Utah 1986) (Zimmerman, J., concurring) (advocating caution and specificity in altering charitable property tax exemption law).

All that being said, we are reversing and remanding this matter for trial and are signaling a change in the employment-at-will law of Utah. Because those joining in the lead opinion have expressed themselves so fully with respect to the direction they think we are taking, I will briefly outline my views on the principal points they raise.

I agree with the lead opinion's characterization of the at-will doctrine as legitimately consisting only of a presumption as to what parties to employment agreements intend, a presumption that properly can be rebutted by a showing of expressed or implied intentions to the contrary. I also agree that logically, this means that no separate consideration is required to overcome the presumption and that mutuality of obligation is not a necessary prerequisite to enforcement of an agreement in derogation of the presumption. It is worth noting that these judicially created impediments to rejection of the at-will doctrine appear to have had their source in the same philosophical impulse that crafted the presumption in the first place.

The courts of many other states have recently developed exceptions to the at-will doctrine. Those exceptions have generally been classified under the headings "public policy," "implied-in-fact," and "covenant of good faith and fair dealing." *See, e.g.,* Dertouzos, Holland, & Ebener, *The Legal and Economic Consequences of Wrongful Termination,* 3602 RAND Inst. for Civ. Just. 1, 5–10, 13 (1988) [hereinafter *Wrongful Termination* ]; Note, *Protecting Employees At–Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv.L.Rev. 1931, 1935–37 (1983). As for the "public policy" exception, I agree with

the lead opinion that such an exception to the at-will presumption should be recognized in Utah, even though it is not applicable in the present case. While I am not prepared to say what the precise content of that exception should be, I am of the view that any cause of action that may accrue to an employee discharged in violation of public policy would not ordinarily be in tort. I would imbed the public policy exception in the law by holding that every employment contract has an implied-in-law covenant that the employee will not be discharged in violation of public policy. Absent proof sufficient to show an independent tort, damages recoverable for a breach of that covenant would be measured by contract principles only. *See Beck v. Farmers Ins. Exch.,* 701 P.2d 795, 800 & n. 3 (Utah 1985).

As for the "covenant of good faith and fair dealing" cause of action recognized by a few courts, most notably the California intermediate appellate courts, I see no need to address whether such a cause of action should be recognized in Utah because it is unnecessary to the decision of this case. But even if the issue were presented, I would not join the lead opinion on this point.

The rubric of a covenant of good faith and fair dealing has been used by the California courts and a few others to effectively impose upon employers in a variety of rather unpredictable circumstances a duty not to deprive employees of the benefits of their employment without just cause. *See Wrongful Termination* at 9–10; *e.g., Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980). Breach of this duty exposes the employer to a tort action for damages. *Cleary,* 111 Cal.App.3d at 456, 168 Cal.Rptr. at 729; *Wrongful Termination* at 10.[2]

The lead opinion recognizes, as we held in *Beck,* that a breach of the covenant of good faith and fair dealing in Utah yields a claim for contract damages only. But the lead opinion completely fails to establish

2. The California Supreme Court has recently overruled *Cleary* to the extent that it permits tort damages for breach of an implied covenant of good faith and fair dealing. *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 700 n. 42, 765 P.2d 373, 401 n. 42, 254 Cal.Rptr. 211, 239 n. 2 (Cal.1988).

predictable guidelines for determining what that duty is and when an employer can be found to owe such a duty to an employee. The result would be to give finders of fact a license to determine the duty's content and to impose their version of the duty, after the fact, on virtually any employer. I can understand the desire to assure that justice is done to individual employees, but the cost of uncertainty for employers is simply too great to justify creation of the cause of action proposed by the lead opinion. Until we have had a better opportunity to consider the minimum rights and obligations that inhere in the employment relationship, as we did in *Beck* with respect to first-party contracts of insurance, I would reject invitations to create this cause of action.

Finally, I come to the exception that can be termed "implied-in-fact." This term describes a trend to make it easier for employees to demonstrate that their employment was not at will and that there were limitations on their employers' right to discharge them. *Wrongful Termination* at 6–8. Although the lead opinion paints a general picture in part V.B.2. of a single line of authority on this issue, the fact is that courts have taken several divergent approaches to the construction of employment agreements and the implication of terms limiting discretion to discharge. *Wrongful Termination* at 6–8; Note, *Protecting At–Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv.L.Rev. 1816, 1820–21 (1980); Annotation, *Modern Status of Rule that Employer May Discharge At–Will Employee for any Reason*, 12 A.L.R. 4th 544, 567–82 (1982 & Supp. 1988). Those approaches range from simply abolishing the requirements of separate consideration and mutuality of obligation to going much further and determining whether the employer has conducted itself so as to limit its right to discharge except for good cause. The cases that exemplify the latter approach reach factually indistinguishable results from those reached in cases decided on the basis of the covenant of good faith and fair dealing. The only distinction is that the implied-in-fact cause

of action is grounded in contract, not tort. *See Pugh v. See's Candies, Inc.*, 116 Cal. App.3d 311, 324–30, 171 Cal.Rptr. 917, 924–27 (1981), *appeal after remand*, 203 Cal. App.3d 743, 250 Cal.Rptr. 195 (1988).

As noted above, I agree with the lead opinion that there need not be any separate consideration for a promise not to discharge at will, and I also agree that there need be no mutuality of obligation before an employee can sue to enforce such a promise. Because the at-will doctrine is only a presumption, the presumption can be rebutted by demonstrating that the parties did not intend the arrangement to be at will. In this context, the representations made by the employer in employee manuals, bulletins, and the like are legitimate sources for determining the apparent intentions of the parties. Because we need go no further than this to decide the present case, I see no need to fix the precise parameters of the implied-in-fact exception. However, having said that, I would *not* follow the most extreme cases that fall into this category, such as *Pugh*, for many of the same reasons that I reject the covenant of good faith and fair dealing cause of action: it provides little predictability, something critical in this area. *See Wrongful Termination* at 7–8.

Turning to the facts of the present case, I conclude that Berube is entitled to have her wrongful discharge claim decided by a jury. Based on the contents of the written policy manual, a reasonable finder of fact could find that the presumption that Berube was an at-will employee had been rebutted. It could also find that the agreement between Berube and Fashion Centre regarding the terms of her employment contained an implied-in-fact term that Fashion Centre would not discharge Berube for a refusal to take a polygraph examination unless that refusal was unreasonable. And, construing the facts in the light most favorable to Berube, a jury could also find that Fashion Centre breached this implied term by requiring Berube to take a third lie detector test when there were no unexplained indications of false testimony in the

first two tests regarding the same shortages.

My conclusion that the jury could find that the agreement between Berube and Fashion Centre barred discharge for a reasonable refusal to take a polygraph examination is supported by the fact that the only other possible interpretation of their agreement would make it one for employment at will. Let me explain: If the agreement between the parties were construed to give Fashion Centre license to ask Berube to take an unlimited number of polygraph examinations and discharge her if, after taking any number, she refused to take one more, it would essentially be an at-will employment agreement. It is certainly within reason for a finder of fact to conclude that this interpretation of the contract is inconsistent with its whole thrust.

For the foregoing reasons, I join only in parts I, II, III, IV, and V.A. of the lead opinion. I agree with the lead opinion that this case should be remanded for retrial on the wrongful discharge claim, at least to the extent that the claim is based on a theory of breach of an implied term of the employment contract. Construing the facts in a light most favorable to Berube, there is sufficient evidence to go to the jury on this issue.

If on remand the finder of fact determines that Fashion Centre did breach the agreement, damages for breach of that contract may be awarded as proven. As we observed in *Beck v. Farmers Insurance Exchange*, both general and consequential damages are available for contract breaches, and consequential damages are "those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." 702 P.2d at 801. And "[t]he foreseeability of any such damages will always hinge upon the nature and language of the contract and the reasonable expectations of the parties." *Id.* (citing J. Calamari & J. Perillo, *Contracts* § 14–5, at 523–25 (2d ed.1977)).